## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CRAFT INTERNATIONAL, LLC, | § | CASE NO. 14-32605-SGJ-11 |
| | § | |
| DEBTOR. | § | |

---

## DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF REORGANIZATION PROPOSED BY CRAFT INTERNATIONAL, LLC

---

**NELIGAN FOLEY LLP**
Patrick J. Neligan, Jr.
Texas State Bar No. 14866000
pneligan@neliganlaw.com
Seymour Roberts, Jr.
Texas State Bar No. 17019150
sroberts@neliganlaw.com

325 N. St. Paul
Suite 3600
Dallas, TX 75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301

**PROPOSED COUNSEL FOR THE DEBTOR**

Dated: June 10, 2014

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. NOTICE TO HOLDERS OF CLAIMS AND INTERESTS...................................1

III. EXPLANATION OF CHAPTER 11 .....................................................................2
    A.    Overview of Chapter 11.............................................................................2
    B.    Plan of Reorganization..............................................................................3

IV. SUMMARY OF THE PLAN.................................................................................5
    A.    Classification and Treatment of Claims and Interests ...............................5
    B.    Means of Implementation of the Plan........................................................8
    C.    Executory Contracts and Unexpired Leases .............................................11

V. DESCRIPTION OF THE DEBTOR.......................................................................12
    A.    Overview of the Debtor's Business Operations.........................................12
    B.    Training Procedures..................................................................................13
    C.    Merchandizing .........................................................................................14

VI. THE DEBTOR'S BANKRUPTCY CASE ...........................................................15
    A.    Factors Leading to the Chapter 11 Filing .................................................15
    B.    Commencement of the Bankruptcy Case...................................................15
    C.    Significant Events During the Bankruptcy Case .......................................16

VII. LITIGATION......................................................................................................16
    A.    Pending Litigation....................................................................................16
    B.    Potential Litigation Under Non-Bankruptcy Law......................................16
    C.    Causes of Action (Including Avoidance Actions) Revest in the
          Reorganized Debtor ..................................................................................17

VIII. CONFIRMATION OF THE PLAN ....................................................................18
    A.    Solicitation of Votes; Voting Procedures .................................................18
    B.    Confirmation Hearing ...............................................................................20
    C.    Requirements For Confirmation of a Plan ................................................21
    D.    Cramdown................................................................................................24

IX. RISK FACTORS ..................................................................................................25
    A.    Insufficient Acceptances...........................................................................25
    B.    Confirmation Risks...................................................................................26
    C.    Conditions Precedent ................................................................................26
    D.    Risk Regarding Amounts and Classification of Claims .............................26
    E.    Competition..............................................................................................26
    F.    Post Confirmation Capital.........................................................................26
    G.    Litigation Risks........................................................................................27

i

**X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .................................................................................................**28**

**XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .....**28**

    A.    Tax Consequences to the Debtor ..............................................29

    B.    Tax Consequences To Noteholders ...........................................29

    C.    Tax Consequences to Holders of Claims ..................................30

    D.    Tax Consequences to Holders of Interests ...............................30

    E.    Information Reporting and Withholding ...................................30

**XII. CONCLUSION** ............................................................................................**31**

## I. INTRODUCTION

Craft International, LLC (the "Debtor"), the above-captioned debtor and debtor-in-possession herein, submits this Disclosure Statement With Respect to Plan of Reorganization (the "Disclosure Statement"). This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan of Reorganization dated June 4, 2014, (the "Plan"), filed and proposed by the Debtor. A copy of the Plan is attached hereto as **Exhibit A**. Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions, Construction, and Interpretation").

For a summary of the proposed treatment of your Claim or Interest under the Plan, please see the charts on page 8 below.

## II. NOTICE TO HOLDERS OF CLAIMS AND INTERESTS

The purpose of this Disclosure Statement is to enable Holders of Claims against and Interests in the Debtor whose Claims and Interests are impaired under, and are entitled to vote on, the Plan to make an informed decision in exercising their right to vote to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT CAREFULLY.**

On _____, 2014, the Bankruptcy Court conducted a hearing on the adequacy of the Disclosure Statement and subsequently entered an order pursuant to § 1125 of the Bankruptcy Code (the "Disclosure Statement Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited Holders of Claims against and Interests in the Debtor, to make an informed judgment with respect to the acceptance or rejection of the Plan. A copy of the Disclosure Statement Order, attached as **Exhibit B**, is included in the materials accompanying this Disclosure Statement. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

Each Holder of a Claim or Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except under this Disclosure Statement and § 1125 of the Bankruptcy Code. Except for the Debtor and its professionals, no person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan, other than the information contained herein, in connection with the solicitation of votes to accept or reject the

Plan. No Holder of a Claim or Interest entitled to vote on the Plan should rely upon any information relating to the Debtor, its business, or the Plan other than that contained in the Disclosure Statement and the exhibits hereto. Unless otherwise indicated, the sources of all information set forth herein are the Debtor and its professionals and matters of record in the Debtor's chapter 11 case.

**After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot (if you are entitled to vote on the Plan) and returning the same to the address set forth on the ballot, in the enclosed return envelope so that it will be received by the Debtor's tabulation agent, Ruth A. Clark, Neligan Foley, LLP, 325 N. St. Paul, Suite 3600, Dallas, TX 75201, no later than 5:00 p.m. Central Daylight Savings ("CDST") on _____, 2014.**

If you do not vote to accept the Plan, or if you are not entitled to vote on the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims or Interests who are entitled to vote on the Plan. See "Confirmation of the Plan — Solicitation of Votes; Voting Procedures," "Confirmation Hearing," "Requirements for Confirmation of a Plan," and "Cramdown" in Article VIII below.

**TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M. CDST, ON _____, 2014.** For detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, see "Solicitation of Votes; Voting Procedures" in Section VIII.A below.

Under § 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on _____, 2014, at _____ __.m. CDST, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. **The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before _____, 2014 at 5:00 p.m. CDST,** in the manner described under the caption, "Confirmation Hearing," in Section VIII.B below.

**THE DEBTOR URGES ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO ACCEPT THE PLAN.**

## III. EXPLANATION OF CHAPTER 11

A. **Overview of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, the debtor in possession attempts to reorganize its business for the benefit of the debtor, its creditors, and other parties in interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the bankruptcy petition is filed.

2

Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the present chapter 11 case, the Debtor has remained in possession of its properties as a debtor in possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, *inter alia*, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in the debtor. Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case (the "Exclusive Period"). However, § 1121(d) of the Bankruptcy Code permits the court to extend or reduce the Exclusive Period upon a showing of "cause." After the Exclusive Period has expired, a creditor or any other party in interest may file a plan, unless the debtor has filed a plan within the Exclusive Period, in which case, the debtor has until the date that is 180 days from the commencement of its chapter 11 case to solicit acceptances of its plan. This additional time during which only a debtor may solicit acceptances of its filed plan is commonly referred to as the solicitation period (the "Solicitation Period"). The Solicitation Period may also be extended or reduced by the court upon a showing of "cause." In the Debtor's Bankruptcy Case, the chapter 11 petition was filed on May 30, 2014 and, correspondingly, the Exclusive Period terminates on September 28, 2014.

## B.     Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide for anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. After a plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, § 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to Holders of Claims against and Interests in the Debtor to satisfy the requirements of § 1125 of the Bankruptcy Code.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may nonetheless deny confirmation of the plan unless the court independently determines that the requirements of § 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests" test and be "feasible." The "best interests" test generally requires that the value of the property to be distributed to the holders of claims and interests under a plan not be less than the value those parties would receive if the debtor were liquidated under a hypothetical liquidation under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.

The Debtor believes that the Plan satisfies all the applicable requirements of § 1129(a) of the Bankruptcy Code, including, in particular, the "best interests" test and the "feasibility" requirement. The Debtor supports confirmation of the Plan and urges all Holders of impaired Claims to accept the Plan.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. At a minimum, however, the plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan. The Bankruptcy Code also defines acceptance of the plan by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting. In the present case, only the Holders of Claims or Interests who are entitled to vote on the Plan, and who actually vote on the Plan, will be counted as either accepting or rejecting the Plan.

In addition, classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity or payment in full in cash. **Under the Plan, Claims against the Debtor in Class 1 and Interests in the Debtor in Class 2 are impaired. The Holders of Class 1 Claims against the Debtor are entitled to vote on the Plan. The Holders of Class 2 Interests in the Debtor are conclusively deemed to have rejected the Plan and are not entitled to vote on the Plan.** Administrative Claims and Priority Tax Claims are unclassified because their treatment is prescribed by the Bankruptcy Code, and the Holders of such Claims are not entitled to vote on the Plan.

A bankruptcy court may also confirm a plan of reorganization even though fewer than all classes of impaired claims and interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

Under § 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if, under the totality of circumstances, there is a reasonable basis for the discrimination, if any, and the extent of the discrimination is reasonable in light of the basis for the discrimination.

The Debtor believes that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims or Interests, and can therefore be confirmed, if necessary, over the objection of any Class of Claims or Interests. The Debtor thus reserves the right to request confirmation of the Plan under the "cramdown" provisions of § 1129 of the Bankruptcy Code.

## IV. SUMMARY OF THE PLAN

THIS IS ONLY A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. THE PLAN INCLUDES OTHER PROVISIONS THAT MAY AFFECT YOUR RIGHTS. YOU ARE URGED TO READ THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN.

### A.   Classification and Treatment of Claims and Interests

The following is a summary of the classification and treatment of Claims and Interests under the Plan. The classification and treatment of Claims and Interests herein is without prejudice to a party in interest asserting that it is entitled to a different classification or treatment under the Plan or applicable law. The Administrative Claims and Priority Tax Claims (i.e., unclassified claims) shown below constitute the Debtor's estimate of the amount of such Claims, taking into account amounts, if any, paid or projected to be paid prior to the Effective Date. The total amount of Claims shown below reflects the Debtor's current estimate of the likely amount of such Claims, subject to the resolution by settlement or litigation of Claims that the Debtor believes are subject to disallowance or reduction. Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Interests.

### 1.   Unclassified Claims Against the Debtor

In accordance with § 1123(a)(1) of the Bankruptcy Code, unclassified Claims against the Debtor consist of Administrative Claims and Priority Tax Claims. Based on its books and records and its projections for future expenses, the Debtor presently estimates the amounts of such Claims, as of the Effective Date, as follows:

| | |
|---|---|
| Administrative Claims | $150,000 |
| Priority Tax Claims | zero |

The foregoing estimate of Administrative Claims includes the following categories:

| | |
|---|---|
| Professional Fees: | $120,000 |
| Claims under Bankruptcy Code section 503(b)(9) | Zero |
| Ordinary Course of Business Claims: | zero |

The Holder of any Administrative Claim that is incurred, accrued or in existence prior to the Effective Date, other than (i) a Fee Claim, (ii) an Allowed Administrative Claim, or (iii) a liability in the Ordinary Course of Business must file with the Bankruptcy Court and serve on all

parties required to receive such notice a request for the allowance of such Administrative Claim on or before thirty (30) days after the Effective Date. Such request must include at a minimum the (i) name of the Holder of the Claim, (ii) amount of the Claim, and (iii) basis of the Claim. Failure to timely and properly file and serve the request (as required under ¶ 2.01(a) of the Plan) will result in the Administrative Claim being forever barred and discharged. Objections to such requests must be filed and served pursuant to the Bankruptcy Rules on the requesting party and the Debtor no later than fourteen (14) days before the hearing on the applicable request for payment of an Administrative Claim. No hearing may be held on less than twenty-eight (28) days notice.

Any Person who holds or asserts an Administrative Claim that is a Fee Claim for compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date shall be required to file with the Bankruptcy Court and serve on all parties required to receive such notice a Fee Application within ninety (90) days after the Effective Date. Failure to timely and properly file and serve a Fee Application as required under ¶ 2.01(b) of the Plan will result in the Fee Claim being forever barred and discharged. No Fee Claim will be deemed Allowed until an order allowing the Fee Claim becomes a Final Order. Objections to Fee Applications must be filed and served under the Bankruptcy Rules on the Debtor and the Person to whose application the objections are filed no later than fourteen (14) days before the hearing on such Fee Application. No hearing may be held on less than twenty-eight (28) days' notice.

An Administrative Claim with respect to which notice has been properly filed under ¶ 2.01(a) of the Plan will become an Allowed Administrative Claim if no timely objection is filed. If a timely objection is filed, the Administrative Claim will become an Allowed Administrative Claim only to the extent Allowed by a Final Order. An Administrative Claim that is a Fee Claim, and with respect to which a Fee Application has been properly filed and served under ¶ 2.01(b) of the Plan, will become an Allowed Administrative Claim only to the extent Allowed by a Final Order.

Holders of Administrative Claims based on liabilities incurred in the Ordinary Course of Business of the Debtor during the Bankruptcy Case (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes; Administrative Claims arising under Bankruptcy Code § 503(b)(9); or alleged Administrative Claims arising in tort) will not be required to file any request for payment of such Claims. Liabilities incurred in the Ordinary Course of Business will be paid by the Debtor under the terms and conditions of the transaction giving rise to such Administrative Claims, without any further action by the Holders of such Administrative Claims. The Debtor reserves the right to object before the Objection Deadline to any claim arising, or asserted as arising, in the Ordinary Course of Business and to withhold payment of such claim until such time as any objection is resolved under a settlement or a Final Order of the Bankruptcy Court.

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Initial Distribution Date, each Holder of an Allowed Priority Tax Claim, in full satisfaction, release, settlement, and discharge of and exchange for such Claim, will receive (a) deferred Cash payments over a period not exceeding five (5) years after the Petition Date in an aggregate

6

principal amount equal to the Allowed amount of such Priority Tax Claim, plus interest, from the Petition Date through the date such Claim is paid in full, on the unpaid portion thereof at the rate of interest determined under applicable nonbankruptcy law as of the calendar month in which the Confirmation Date occurs, in equal annual installments with the first payment to be due on the later of (i) the Initial Distribution Date or (ii) five (5) Business Days after the date a Priority Tax Claim becomes an Allowed Priority Tax Claim, and subsequent payments to be due on each anniversary of the Initial Distribution Date, or (b) such other, less favorable treatment to which such Holder and the Debtor agree in writing. Notwithstanding the foregoing, (a) the Holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim, and (b) the Debtor will have the right to pay any Allowed Priority Tax Claim, or any unpaid balance of such Claim, in full, at any time after the Effective Date, without premium or penalty.

The Debtor will timely pay to the United States Trustee all quarterly fees incurred under 28 U.S.C. § 1930(a)(6). Any fees due as of the most recent quarterly invoice before the Confirmation Date will be paid in full within thirty (30) days after the Effective Date. After the Effective Date, the Debtor will pay United States Trustee quarterly fees as they accrue until the Bankruptcy Case is closed. The Debtor will serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) that the Bankruptcy Case remains open.

### 2. Classified Claims and Interests

The following is an estimate of the numbers and amounts of classified Claims and Interests to receive treatment under the Plan, and their respective treatment:

UNLESS OTHERWISE NOTED, THE DEBTOR'S ESTIMATES OF THE NUMBER AND AMOUNT OF CLAIMS IN EACH CLASS SET FORTH IN THE TABLE BELOW INCLUDE ALL CLAIMS ASSERTED AGAINST THE DEBTOR WITHOUT REGARD TO THE VALIDITY OR TIMELINESS OF THE FILING OF THE CLAIMS. THUS, BY INCLUDING ANY CLAIM IN THE ESTIMATES SET FORTH BELOW, THE DEBTOR IS NOT WAIVING ITS RIGHTS TO OBJECT TO ANY CLAIM ON OR BEFORE THE CLAIM OBJECTION DEADLINE ESTABLISHED BY THE PLAN. IN ADDITION, THE DEBTOR HAS NOT YET UNDERTAKEN AN ANALYSIS OF POTENTIAL AVOIDANCE ACTIONS, AND ALTHOUGH THE DEBTOR DOES NOT CURRENTLY ANTICIPATE ASSERTING SUCH ACTIONS BECAUSE ALL ALLOWED CLAIMS WILL BE SATISFIED IN FULL UNDER THE PLAN (SEE ¶ VII.C BELOW), THE DEBTOR IS NOT WAIVING ITS RIGHT TO ASSERT AVOIDANCE ACTIONS. HOWEVER, WHETHER THE REORGANIZED DEBTOR WILL PROSECUTE ANY AVOIDANCE ACTIONS WILL BE DETERMINED BY THE NEW MEMBERS OF THE REORGANIZED DEBTOR AND THEIR MANAGEMENT TEAM. PAYMENTS RECEIVED BY NON-INSIDER CREDITORS WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE AND BY INSIDER CREDITORS WITHIN ONE YEAR PRIOR TO THE PETITION DATE ARE LISTED IN THE DEBTOR'S SCHEDULES ON FILE WITH THE COURT. A COPY OF THE SCHEDULES IS AVAILABLE FOR EXAMINATION ON PACER OR BY WRITTEN REQUEST SENT TO THE DEBTOR'S COUNSEL.

| Class | Treatment |
|---|---|
| Class 1 —General Unsecured Claims<br><br>Estimated Amount:  $2,955,916.60<br><br>Estimated Number:  51 | Impaired<br><br>Class 1 Claims will be paid on the Effective Date by the Debtor canceling its existing membership units under the Old LLC Agreement and issuing 1 million new membership units in favor of the General Unsecured Creditors under the New LLC Agreement.  A copy of the New LLC Agreement will be filed with the Court within fifteen (15) days of the Confirmation Hearing.  Each General Unsecured Creditor will be allocated the number of new membership units equal to their *pro rata* position vis-à-vis the other General Unsecured Creditors. |
| Class 2 – Interests in the Debtor Claims<br><br>Estimated Amount:  $<br><br>Estimated Number:  2 | Impaired<br><br>On the Effective Date, the Class 2 pre-petition Interests, membership units, in the Debtor will be cancelled under the Old LLC Agreement. |

## B.     Means of Implementation of the Plan

### 1.     Plan Distributions; Sources of Funds for Distributions Under the Plan

The Debtor will make all Distributions required under the Plan, subject to the provisions of the Plan.  The sources of Cash necessary for the Debtor to pay Administrative Expenses and Allowed Claims that are to be paid in Cash by the Debtor under the Plan will be:  (a) the Cash of the Debtor on hand as of the Effective Date; (b) Cash arising from the operation, ownership and maintenance of the Debtor and Assets owned, managed, and/or serviced by or at the direction of the Debtor on or after the Effective Date; (c) any Cash generated or received by the Debtor on or after the Effective Date from any other source, including, without limitation, any recoveries from the prosecution of all Causes of Action; and (d) any Cash loaned or infused by some or all of the Members of the reorganized Debtor.

### 2.     Debtor's Management and Operations Post-Effective Date

From and after the Effective Date, the Debtor shall retain title, ownership, possession, and control over its intellectual property and all other Assets in its Estate, under the New LLC Agreement.  As of the Effective Date the membership units in the reorganized Debtor will be held by the Holders of Allowed General Unsecured Claims.  Pursuant to the New LLC Agreement, the members of the reorganized Debtor may hire new or additional management.  As of the Effective Date, Steve Young ("Young") will continue as the Manager and Chief Executive Officer.  Bo French ("French") will continue as the Chief Operating Officer.  Both men will continue in those positions at the pleasure of the New Members and will each to be entitled to payment of his current salary of $85,000 per year or such other compensation as may be agreed upon with the New Members.

### 3. Vesting of Assets

Except as otherwise provided in the Plan and the Confirmation Order, all property and Assets of the Debtor will vest in the Debtor, as reorganized under and in accordance with the terms of the Plan, free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests. To the extent any unrecorded Liens against or ownership interests (including, without limitation, tenancy in common interests) in any such Assets exist or are asserted by third parties, such Liens and interests will be voided and transferred to the Debtor as of the Effective Date. Commencing on the Effective Date, the Debtor may deal with the Assets and its property and conduct its business without any supervision by, or permission from, the Bankruptcy Court or the Office of the United States Trustee, and free of any restriction imposed on the Debtor by the Bankruptcy Code or by the Bankruptcy Court during the Bankruptcy Case, other than any restrictions contained in the Plan, the Confirmation Order, and related documents.

### 4. Discharge of the Debtor

Except as provided in the Bankruptcy Code, the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against and Interests in the Debtor of any nature whatsoever, whether known or unknown, or against the Assets of the Debtor that arose before the Effective Date. Except as provided in the Bankruptcy Code, the Plan or the Confirmation Order, upon the Effective Date, entry of the Confirmation Order acts as a discharge and release under Bankruptcy Code § 1141(d)(1)(A) of all Claims against and Interests in the Debtor and its Assets, arising at any time before the Effective Date, regardless of whether a proof of Claim or Interest was filed, whether the Claim or Interest is Allowed, or whether the Holder of the Claim or Interest votes to accept the Plan or is entitled to receive a Distribution under the Plan. Except as provided in the Plan or the Confirmation Order, upon the Effective Date, any Holder of a discharged Claim or Interest will be precluded from asserting against the Debtor or any Assets of the Debtor any other or further Claim or Interest based on any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred before the Effective Date. Except as provided in the Plan or the Confirmation Order, and subject to the occurrence of the Effective Date, the Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtor to the extent allowed under Bankruptcy Code § 1141, and the Debtor will not be liable for any Claims or Interests and will only have the obligations as are specifically provided for in the Plan.

### 5. Exculpation

*The Debtor and any of its respective present or former principals, agents, members, officers, directors, employees, advisors, professionals including but not limited to Neligan Foley LLP, representatives, successors, and assigns, will not have or incur any liability or obligation, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, and whether asserted or assertable directly or derivatively, in law, equity, or otherwise, to any Holder of a Claim or Interest or any other Person for any act or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Debtor, the Estate, the administration of the Bankruptcy Case, the operation of the Debtor's business during the*

9

*Bankruptcy Case, the formulation, negotiation, preparation, filing, dissemination, approval, or confirmation of the Plan, the Disclosure Statement, the solicitation of votes for or confirmation of the Plan, the consummation or administration of the Plan, or the property to be distributed under the Plan, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction. The foregoing parties will be entitled to rely reasonably upon the advice of counsel in all respects regarding their duties and responsibilities under the Plan.*

### 6. Injunction

*Except as otherwise provided in the Plan, the Confirmation Order will provide that from and after the Effective Date, all Holders of Claims against and Interests in the Debtor are permanently enjoined from taking any of the following actions against the Debtor or any of its Assets on account of any such Claim or Interest: (a) commencing or continuing in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance or Lien; (d) asserting a setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (e) commencing or continuing, in any manner or in any place, any action that does not conform to or comply with, or is inconsistent with, the provisions of the Plan; provided, however, that nothing contained herein will preclude such Persons from exercising their rights under and consistent with the terms of the Plan or the Confirmation Order. If allowed by the Bankruptcy Court, any Person injured by any willful violation of such injunction will recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.*

### 7. Revocation or Withdrawal of the Plan

The Debtor reserves the right to revoke and/or withdraw the Plan at any time before the Confirmation Date. If the Debtor revokes or withdraws the Plan, or if confirmation or the Effective Date of the Plan does not occur, then the Plan will be deemed null and void. In such event, nothing contained herein will be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor or any other Person.

### 8. Modification of the Plan

The Debtor reserves the right to modify the Plan in writing at any time before the Confirmation Date, provided that (a) the Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123 and (b) the Debtor will have complied with Bankruptcy Code § 1125. The Debtor further reserves the right to modify the Plan in writing at any time after the Confirmation Date and before substantial consummation of the Plan, provided that (a) the Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123, (b) the Debtor will have complied with Bankruptcy Code § 1125, and (c) the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under Bankruptcy Code § 1129. A Holder of a Claim or Interest that has accepted or rejected the Plan will be deemed to have accepted or

rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

## C.    Executory Contracts and Unexpired Leases

The Plan constitutes and incorporates a motion under Bankruptcy Code §§ 365 and 1123(b)(2) to (a) reject, as of the Effective Date, all Executory Contracts to which the Debtor is a party, except for any Executory Contract that was terminated before the Effective Date or has been assumed or rejected under an order of the Bankruptcy Court entered before the Effective Date, and (b) assume all Executory Contracts identified in the Schedule of Assumed Contracts that is attached as **Exhibit C**.

The Old LLC Agreement will be amended and modified as provided in the New LLC Agreement, and as so amended and modified, will be assumed and included in the Schedule of Assumed Contracts; provided, that no Cure Amount will be Allowed with respect to the assumption of the New LLC Agreement. The Debtor anticipates that the New LLC Agreement will cancel the existing membership units under the Old LLC Agreement and issue 1 million new membership units in favor of the General Unsecured Creditors. Each General Unsecured Creditor will be allocated the number of membership units equal to its *pro rata* position vis-à-vis the other General Unsecured Creditors.

The Confirmation Order will constitute an order of the Bankruptcy Court under Bankruptcy Code §§ 365 and 1123(b)(2) approving the rejection or assumption, as applicable, of Executory Contracts under the Plan as of the Effective Date. Notice of the Confirmation Hearing will constitute notice to any non-debtor party to an Executory Contract that is to be assumed or rejected under the Plan of the proposed assumption or rejection of such Executory Contract and any proposed Cure Amount.

Except as otherwise provided in a Final Order, under Bankruptcy Code §§ 365(a), (b), (c) and (f), all Cure Amounts that may require payment under Bankruptcy Code § 365(b)(1) under any Executory Contract that is assumed under a Final Order of the Bankruptcy Court (which may be the Confirmation Order) will be paid by the Debtor within fifteen (15) Business Days after such order becomes a Final Order with respect to undisputed Cure Amounts or within fifteen (15) Business Days after a Disputed Cure Amount is Allowed by agreement of the parties or a Final Order. If a party to an assumed Executory Contract has not filed an appropriate pleading on or before the date of the Confirmation Hearing disputing any proposed Cure Amount, the cure of any other defaults, the promptness of the Cure Amount payments, or the provisions of adequate assurance of future performance, then such party will be deemed to have waived its right to dispute such matters.

Notwithstanding the foregoing, the Debtor may, in its sole discretion, file a motion to reject any Executory Contract as to which a Cure Claim is established by an order of the Bankruptcy Court, and any such motion will be filed no later than five (5) Business Days after the order of the Bankruptcy Court allowing such Cure Claim becomes a Final Order.

If the rejection of an Executory Contract gives rise to a Claim by any non-Debtor party or parties to such Executory Contract, such Claim will be forever barred and will not be enforceable

against the Debtor, the Estate, or the agents, successors, or assigns of the foregoing, unless a proof of such Claim is filed with the Bankruptcy Court and served upon the Debtor on or before the Rejection Bar Date. Any Holder of a Claim arising out of the rejection of an Executory Contract that fails to file a proof of such Claim on or before the Rejection Bar Date will be forever barred, estopped, and enjoined from asserting such Claim against the Debtor, the Estate or any of their Assets. Nothing contained in the Plan will extend the time for filing a proof of Claim for rejection of any Executory Contract rejected before the Confirmation Date.

Any Rejection Claim arising from the rejection of an Executory Contract will be treated as a General Unsecured Claim under the Plan, except as limited by the provisions of Bankruptcy Code §§ 502(b)(6) and 502(b)(7) and mitigation requirements under applicable law. Nothing contained herein will be deemed an admission by the Debtor that such rejection gives rise to or results in a Rejection Claim or will be deemed a waiver by the Debtor or any other party in interest of any objections to such Rejection Claim if asserted.

## V. <u>DESCRIPTION OF THE DEBTOR</u>

### A.     Overview of the Debtor's Business Operations

Craft is a consulting and training services provider offering a wide range of services and training to federal, state and local customers. Craft specializes in providing turnkey mission solutions to ensure complete operation success. Craft consults with and trains our nation's Special Operators and First Responders. Craft was founded by a mix of Special Operations Forces Operators and successful businessmen. Craft is a leader in integrated training and security solutions for operations in austere environments and situations.

Craft provides a combination of management consulting, technical expertise, and operational knowledge to provide training and solutions for its customers. Craft was co-founded by Chris Kyle ("Chris" or "Kyle"), USN (SEAL), one of the top snipers in the history of American Armed Forces, upon his honorable discharge in 2009. Craft employs a team of subject matter experts in a variety of specialties who share in the goal to provide the best training and solutions to those who need it most. Craft now provides professional consulting and management solutions in addition to training.

Craft distinguishes itself from other similar organizations through a mix of success in business and a deep bench of subject matter experts. Craft draws upon the collective experiences of its instructor cadre who have, and in many respects still do, operate at a high level of responsibility. Craft provides the most current and effective training available to the armed forces of the United States and its allies. The Craft team has decades of collective combat-honed military experience, and understands the importance of realistic, intense training and preparation. Craft's strength lies in its instructors and subject matter experts who have gained specialized skills that very few possess and, more importantly, they have implemented these skills and advanced their expertise in the most stressful situations.

Craft has the competencies, experiences, and necessary facilities to be an essential training provider to Special Operations Forces customers. Craft offers a curriculum relevant to the special operators of elite forces and can leverage these for future programs. Craft is uniquely

positioned, geographically located, and staffed with all of the elements to deliver solutions to its customers. Craft understands that discretion and low visibility are essential elements to particular training programs and is committed to these elements. Staying out of the spotlight and implementing a discreet profile are crucial to Craft's success.

Since its founding, Craft has been committed to operating in a complete and cohesive manner. Craft aims to develop solutions and improve its customers' and partner's abilities. Craft adapts and evolves as necessary to produce lasting results, and Craft's success lies in the holistic and integrated strategies that it implements to mitigate risks and produce success.

**B.      Training Procedures**

Craft's approach to training is reality and experienced-based. Craft draws heavily upon the collective experiences of its instructor cadre who have, and still do operate at a level of responsibility that is entrusted to only true professionals who are consummate students in their own right of their respective "crafts." Craft believes that: instructors instruct, but teachers teach and find a way to reach all students through a variety of modalities and methods. Craft's instructors are teachers who exemplify humility, professionalism, and expertise. Craft's instructors display a tremendous amount of respect for their students so that they have the best "real life experience" while training at Craft.

Craft's training procedures include the following:

- **Military Training.** The military training available at Craft can be customized to suit the needs of the customer including, without limitation, large-scale pre-deployment training or specific instruction in one particular skill. Students can be trained at Craft's Desert Training facility outside of Phoenix, Arizona, or where needed. Craft can facilitate military training at other unique locations and handle all logistical aspects of a unit to conduct its own military training. Craft understands the importance of realistic, intense training and preparation; and understands that every unit's needs are different. Craft works to develop a program that fits the needs and responsibilities of each of its customers, giving them the tools that they will need in combat. In addition to customizable courses, Craft offers several courses designed specifically for military operators such as sniper courses, counter terrorist courses, close quarter combat courses, specialty courses, and driving courses.

- **Law Enforcement.** The law enforcement training at Craft is based upon Craft's vast network of instructors who have extensive backgrounds in a variety of law enforcement related subjects. Many of Craft's instructors have a combination of military, law enforcement and defense contractor experience to draw upon in order to support the curriculum anecdotally and deliver exceptional training. Craft recognizes the importance of providing law enforcement officers with comprehensive training to address a wide array of increasingly dangerous and sophisticated threats. Many of Craft's staff have extensive law enforcement experience and have trained various police and SWAT units around the country.

13

In addition to customizable courses, Craft offers several courses designed ideally for law enforcement officers such as sniper courses, and large caliber courses.

- **Combative Training Program.** The object of Craft's combative training is to help the customer learn how to create tactical transitions and solutions to and from his or her firearm. Each operator will understand his or her limitations and natural habits and begin to work on the solutions that will create the necessary time and distance needed to deploy the firearm. Each student will learn the science of behavior and how to recognize lethal intent within his or her adversary. This is taught under Craft's exclusive Tacflow™ Method. All disciplines from firearm to hands-on technology are learned. The Tacflow™ Method is the blending of the old technologies of Kali and Silat (Filipino, Indonesian and Malaysian bladed and empty handed combatives) with the weapons that law enforcement and military find themselves fighting with today. The technology that is taught is strictly for LE, MIL, and DOD personnel only. Courses cover combatives in the close quarters environment with an intent to end the engagement by creating time, distance and opportunity to maintain the tactical flow. Through drills that easily translate from the student's pre-existing shooting and movement skills, the student will be able to effectively learn how to move better in the "hands-on" engagement.

- **Civilian and Corporate Training.** Craft offers training to law abiding civilians looking to increase their own self-reliance to protect themselves or their families, or to increase their long range rifle skills as sportsmen. Craft's civilian training events are run at Rough Creek Lodge & Resort, which is a Five Star resort on 11,000 acres outside of Glen Rose, Texas. The range facilities include a 1,300 yard range, a 100 yard carbine range with an Action Target system and a 50 yard range for pistol and carbine work. Class subject matters include precision marksman, defensive pistol, defensive carbine, business traveler awareness, and home invasion.

- **Government Contracting.** Craft is a Tactical Training Provider and offers a wide range of services and training to its Federal Customers. This tactical training includes: (a) weapons training (e.g., pistol, carbine, sniper, combatives); (b) tactical medical training, including LTT; (c) tactical driving; (d) CONOPS and battle space integration; and (e) security (e.g., PSD and facility security).

## C.    Merchandizing

Craft has a trademarked logo in the shape of a skull which is surrounded by the adage "Despite what your Momma told you violence does solve problems." There is a crosshair in the right eye of the skull. The crosshair symbolizes Kyle's time spent as a sniper and is also in the shape of a Templar cross to symbolize faith. Kyle and his fellow U.S. Navy SEALs painted similar skulls on their gear in order to strike fear in the enemy. Craft stamps that logo onto a variety of merchandise that is then sold to the public at large. This merchandise includes, without limitation: (a) accessories (e.g., barware, decals, patches, jewelry, coolers, coffee mugs);

14

(b) headwear (e.g., caps, beanies); (c) men's apparel (e.g., tee shirts, shorts, board shorts); and (d) ladies' apparel (e.g., tee shirts).

Craft also sells tactical gear to be worn in the field during operations including, without limitation, pants, shirts, outerwear, footwear, backpacks and bags, fitness products, eyewear, and products specifically targeted to law enforcement operations and fire/EMS operations. Some of these items can be purchased with the Craft logo skull stamped on them. Based on the most recent sales since the State Court Action, the Debtor does not believe that the Debtor's logo has substantial value. Taya Kyle ("Taya"), Chris's widow, disagrees and believes that the Debtor's logo does have substantial value.

## VI.  THE DEBTOR'S BANKRUPTCY CASE

### A.  Factors Leading to the Chapter 11 Filing

The Debtor filed its chapter 11 Bankruptcy Case as a result of the convergence of the following factors: (1) the Debtor's inability to pay its debts as those debts became due including vendor and noteholder debts; (2) the loss of two independent contractors; (3) the loss of training contracts; (4) the Debtor's cash running out; and (5) a substantial decrease in merchandise sales. The Debtor traces the occurrence of these factors to the litigation filed by Taya styled *Taya Kyle v. Craft International LLC, Craft International Risk Management, LLC, Steven Young and Bo French*, Cause No. DC-13-14996 (the "State Court Action") in the 14th Judicial District Court of Dallas County, Texas. As of the Petition Date, the Debtor could not pay its debts as they became due and was, therefore, insolvent.

### B.  Prior Bankruptcy Case

The Debtor originally filed a bankruptcy case in the Northern District of Texas, Dallas Division, Case No. 14-30918, on February 24, 2014. That bankruptcy case was dismissed without prejudice on May __, 2014 because the Debtor's written consent to file for bankruptcy was signed by the Debtor's Manager instead of the Debtor's Members under § 4.9, p. 15 of the Debtor's Amended and Restated Company Agreement. Although Taya had challenged the petition arguing that it had been filed in bad faith, the Bankruptcy Court specifically found that the filing of the petition was not a bad faith filing and dismissed the case without prejudice solely because the written consent of the Members under § 4.9 of the Debtor's Amended and Restated Company Agreement was made after the filing and did not relate back to the petition date. The Debtor addressed and cured that consent issue by having its new bankruptcy consent signed by the Debtor's Members pre-petition, and refiled a voluntary petition for relief under chapter 11 of the Bankruptcy Code on the new Petition Date.

### C.  Commencement of the Bankruptcy Case

On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating the above-captioned Bankruptcy Case. The Debtor's Bankruptcy Case was assigned to the Honorable Judge Barbara J. Houser, United States Bankruptcy Judge for the Northern District of Texas, Dallas Division.

### D.     <u>Significant Events During the Bankruptcy Case</u>

#### 1.     **Retention of Bankruptcy Counsel for the Debtor**

On _____, 2014, the Debtor filed an Application [D.E. \_\_] to employ Neligan Foley LLP as bankruptcy counsel to the Debtor. The Bankruptcy Court granted that Application by an order entered on _____, 2014.

#### 2.     **Schedules and Statement of Financial Affairs**

On the Petition Date, the Debtor filed its Schedules of Assets [D.E. 4] and Liabilities and its Statement of Financial Affairs [D.E. 5].

## VII.  <u>LITIGATION</u>

### A.     **Pending Litigation**

On the Petition Date, the only pending litigation against the Debtor was the State Court Action. A copy of the *Plaintiff's Original Petition, Application For Order Requiring Inspection of Craft's Books and Records, Application for Temporary Restraining Order and Temporary and Permanent Injunctive Relief & Application For Receiver* is attached as **Exhibit D**, and a copy of the *Defendants' Original Answer* is attached as **Exhibit E**.

### B.     **Potential Litigation Under Non-Bankruptcy Law**

Any and all potential claims and Causes of Action of the Debtor arising from the circumstances described above or otherwise are expressly preserved under the Plan and vested in the reorganized Debtor upon the Effective Date of the Plan. The Debtor's causes of action under non-bankruptcy law may include the following:

- <u>Claims Against Taya</u>. The Debtor believes that it may have claims against Taya for tortious interference with business and other state law claims related to Taya's efforts to publicize her litigation and dispute with the Debtor and its members. Likewise, the Debtor may have claims against those individuals or entities who aided and abetted Taya. The reorganized Debtor will consider not only the merits of those claims but also the collectability from Taya and the other potential defendants.

- <u>Claims Related to Chris Kyle's Books and Movies</u>. The books <u>American Sniper</u> and the <u>American Gun</u> were written by Chris during his employment by the Debtor and both books required much of his time during the workday. Chris's book tours and promotion efforts for these books were done as part of his job at the Debtor. The Debtor may seek discovery and may potentially make demand on the companies that published those books for the Debtor's share of its royalties, and may potentially make demand on any and all entities producing and making the movie "American Sniper" for the Debtor's share of the royalties and other payments which will be paid by those entities. Likewise, the Debtor may seek discovery and potentially bring a claim against Taya for the Debtor's share of the revenues paid to Taya and generated by the movie "American

Sniper" and the two books. The Debtor anticipates that this litigation may be taken on a contingency fee arrangement by counsel representing the reorganized Debtor. Obviously, whether the litigation is pursued will be determined by the management and new owners of the reorganized Debtor.

- Derivative Claims in the State Court Litigation. With respect to the claims asserted in the State Court Litigation for breach of fiduciary duty and other similar claims, those claims which belong to the bankruptcy estate will be examined by the Debtor's new members and a determination made as to whether the reorganized Debtor will continue to litigate those claims. The reorganized Debtor will consider not only the merits of those claims but also the collectability from Young and French. Neither Young nor French has been paid a salary in almost two years, and a judgment may not be collectable.

## C.    Causes of Action (Including Avoidance Actions) Revest in the Reorganized Debtor

Section 547 of the Bankruptcy Code enables a debtor in possession to avoid a transfer to a creditor made within 90 days before the petition date (or within one year before the petition date in the case of a transfer to an insider) if the transfer was made on account of an antecedent debt and enabled the creditor to receive more than it would in a liquidation. A creditor can assert certain defenses to the avoidance of such a preferential transfer based upon, among other things, the transfer having occurred as part of the ordinary course of the debtor's business or that, subsequent to the transfer, the creditor having provided the debtor with new value. Section 548 of the Bankruptcy Code allows a debtor in possession to avoid a transfer to a creditor made within one year before the petition date if (a) the transfer was made with actual intent to hinder, delay, or defraud other creditors or (b) the transfer was for less than reasonably equivalent value and the debtor was insolvent or undercapitalized at the time of the transfer or became insolvent or undercapitalized as a result of the transfer.

A list of all transfers by the Debtor to unsecured creditors within 90 days before the Petition Date, and one year to "insiders," as that term is defined in the Bankruptcy Code, and which includes members of the Debtor, is provided in the Debtor's Statements of Financial Affairs [D.E. 5] filed with the Bankruptcy Court on May 30, 2014. A copy of that list is attached as **Exhibit F**. Anyone concerned about potential preferential transfers should review that list.

As of the Effective Date, all Causes of Action (including, without limitation, all Avoidance Actions, whether based on §§ 547 and 548 of the Bankruptcy Code or otherwise) will revest in the Debtor, as reorganized under the Plan. In accordance with § 1123(b)(3)(B) of the Bankruptcy Code, the reorganized Debtor will retain the exclusive right to assert, prosecute, settle, or compromise any Cause of Action vested in it under the Plan as well as any and all defenses, counterclaims, and rights that have been asserted or could be asserted by the Debtor against or with respect to all Claims asserted against the Debtor or property of the Debtor's Estate. Whether the reorganized Debtor will prosecute any avoidance action will be determined by the new members of the reorganized Debtor and its management team. Whether the reorganized Debtor will recover any net proceeds from avoidance actions or non-bankruptcy causes of action cannot be determined at this point in time. The recovery by creditors under the Plan does not depend on litigation recoveries.

17

Notwithstanding the foregoing, the Debtor has determined that because all Allowed Claims are satisfied in full under the Plan, the Debtor does not currently intend (but does not hereby waive the right) to assert or prosecute any Avoidance Actions except as a defense to any Claim or a setoff asserted by any Holder of a Claim.

## VIII. CONFIRMATION OF THE PLAN

### A.      Solicitation of Votes; Voting Procedures

#### 1.      ~~Ballots and Voting Deadlines~~

A ballot to be used for voting to accept or reject the Plan, together with an addressed return envelope, is enclosed with all copies of this Disclosure Statement that have been mailed to all Holders of Claims and Interests entitled to vote. BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

**The Bankruptcy Court has directed that in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than 5:00 p.m. CDST on _____, 2014, at the following address or fax number:**

> **Ruth A. Clark**
> **Neligan Foley LLP**
> **325 N. St. Paul, Suite 3600**
> **Dallas, Texas 75201**
> **Fax: 214-840-5301**

**YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED AT THE ABOVE ADDRESS OR FAX NUMBER AFTER 5:00 P.M. CDST ON _____, 2014.**

### 2.      Parties in Interest Entitled to Vote

Any Holder of a Claim or Interest against the Debtor as of the Voting Record Date (_____, 2014) and whose Claim or Interest has not previously been disallowed by the Bankruptcy Court is entitled to vote to accept or reject the Plan, if such Claim or Interest is impaired under the Plan and either (a) such Holder's Claim has been scheduled by the Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), (b) such Holder of an Interest has been identified in the Debtor's Statement of Financial Affairs filed with the Bankruptcy Court or is authorized by the Bankruptcy Court to vote on the Plan, or (c) such Holder has filed a proof of Claim or Interest on or before the Bar Date.[1] The Holder of a Claim or Interest as to which an objection has been filed is not entitled to vote unless the Bankruptcy Court, upon motion of the Debtor or the Holder to whose Claim or Interest an objection has been made, temporarily allows such Claim or Interest in an amount that it deems proper for the

---

[1]      If a Holder did not file a proof of claim on or before the Bar Date, but such Holder subsequently obtained an order from the Bankruptcy Court allowing the Holder to file a proof of Claim or Interest thereafter, such Holder will be entitled to vote to accept or reject the Plan.

purpose of voting to accept or reject the Plan. Any such motion must be heard and determined by the Bankruptcy Court on or before commencement of the Confirmation Hearing. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 3. Definition of Impairment

As set forth in § 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan of reorganization unless, with respect to each claim or equity interest of such class, the plan:

(a) leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity interest; or

(b) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default:

(i) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in § 365(b)(2) of the Bankruptcy Code;

(ii) reinstates the maturity of such claim or interest as it existed before such default;

(iii) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

(iv) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

### 4. Classes Impaired Under the Plan

Classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Classes of Claims or Interests that are impaired under a plan and are not receiving any distribution under the plan are conclusively presumed to have rejected the plan and thus are not entitled to vote on the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class and are receiving a distribution under the plan. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity, or payment in full in Cash.

19

Claims against the Debtor in Class 1, are impaired, will receive a distribution under the Plan, and so are entitled to vote on the Plan. Interests in the Debtor in Class 2 are impaired, will not receive a distribution under the Plan, are conclusively presumed to have rejected the Plan and so are not entitled to vote on the Plan.

Administrative Expense Claims and Priority Tax Claims are unclassified. The Bankruptcy Code prescribes the treatment of those Claims, and the Holders of such Claims are not entitled to vote on the Plan.

**5.      Vote Required For Class Acceptance**

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that actually cast ballots for acceptance or rejection of the Plan. The Bankruptcy Code also defines acceptance of the plan by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting.

**B.      Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. By order of the Bankruptcy Court, **the Confirmation Hearing on the Plan has been scheduled for _____, 2014 at __:__ __.m. CDST** in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement made at the confirmation hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. **Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court on or before _____, 2014 at __:__ __.m. CDST,** at the following address:

Clerk of the United States Bankruptcy Court
Northern District of Texas, Dallas Division
1100 Commerce Street, Room 1254
Dallas, Texas 75242

In addition, any such objection must be served upon the following parties, together with proof of service, so that they are *received* **by such parties on or before 5:00 p.m. CDST on** _____, 2014:

Patrick J. Neligan, Jr.
Seymour Roberts, Jr.
Neligan Foley LLP
325 N. St. Paul, Suite 3600
Dallas, TX 75201
(214) 840-5301 (fax)
Email:  pneligan@neliganlaw.com
        sroberts@neliganlaw.com
**COUNSEL FOR THE DEBTOR**

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and the Order Approving Disclosure Statement and Setting Deadline for Objections.  **UNLESS AN OBJECTION TO CONFIRMATION IS SERVED AND FILED ON THE DEBTOR AND ITS COUNSEL SO THAT IT IS ACTUALLY RECEIVED BY NO LATER THAN 5:00 P.M. CDST ON _____, 2014, THE BANKRUPTCY COURT MAY NOT CONSIDER IT.**

The Debtor believes that the key dates leading up to and including the Confirmation Hearing may be summarized as follows:

1.      _____, 2014, 5:00 p.m. CDST:  Deadline for parties to file and serve any objection to the Plan.

2.      _____, 2014, 5:00 p.m. CDST:  Deadline for parties entitled to vote on the Plan to have their ballots received by the tabulation agent.

3.      _____, 2014, 5:00 p.m. CDST:  Commencement of the Confirmation Hearing.

**C.      Requirements For Confirmation of a Plan**

At the Confirmation Hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  As set forth in § 1129 of the Bankruptcy Code, these requirements are as follows:

1.      The plan complies with the applicable provisions of the Bankruptcy Code.

2.      The proponent of the plan complied with the applicable provisions of the Bankruptcy Code.

3.      The plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or promised by the debtor, by the plan proponents, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and

21

incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

    5.    (a)    (i)    The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

    (ii)    the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

    (b)    the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

    6.    Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor have approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

    7.    With respect to each impaired class of claims or interests:

    (a)    each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor liquidated on such date under chapter 7 of the Bankruptcy Code on such date; or

    (b)    if § 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

    8.    With respect to each class of claims or interests:

    (a)    such class has accepted the plan; or

    (b)    such class is not impaired under the plan.

    9.    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

    (a)    with respect to a claim of a kind specified in § 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such

claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b) with respect to a class of claims of a kind specified in § 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive:

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(c) with respect to a claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim regular installment payments in cash –

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under § 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under § 1122(b)); and

(d) with respect to a secured claim that would otherwise meet the description of an unsecured claim of a governmental unit under § 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as described in subparagraph (c) above.

10. If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

11. Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12. All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payments of all such fees on the effective date of the plan.

13.     The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in § 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of § 1114, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all the requirements of chapter 11, and that the Plan is proposed in good faith.

## D.     Cramdown

If any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that Class. A plan of reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims. As set forth in § 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.     With respect to a class of *secured claims*, the plan provides:

(a)     (i)     that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)     that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)     for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (c) of this paragraph 1; or

(c)     the realization by such holders of the "indubitable equivalent" of such claims.

2.     With respect to a class of *unsecured claims*, the plan provides:

(a)     that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b)     the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

3.     With respect to a class of *equity interests*, the plan provides:

(a)     that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(b)     that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

If any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any such Class.  For the reasons set forth above, the Debtor believes the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired Class of Claims or Interests.

## IX.  RISK FACTORS

The following is intended as a summary of certain risks associated with the Plan, but it is not exhaustive and must be supplemented by the analysis and evaluation made by each Holder of a Claim or Interest of the Plan and this Disclosure Statement as a whole with such Holder's own advisors.

**A.     Insufficient Acceptances**

For the Plan to be confirmed, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan, unless the Plan provides that the Holders in such Class will not receive any Distribution under the Plan (in which event such Holders are deemed to reject the Plan).  With regard to such impaired voting Class, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by claimants of such Class who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims in that Class that actually vote on the Plan.  Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.  The Debtor reserves the right to request confirmation of the Plan pursuant to the cramdown provisions in § 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan even if a particular Class of impaired Claims has not accepted the Plan.  However, there can be no assurance that the Debtor would succeed in achieving confirmation of the Plan under the cramdown provisions of the Bankruptcy Code with respect to any other impaired Classes that do not accept the Plan.

**B.      Confirmation Risks**

The following specific risks exist with respect to confirmation of the Plan:

(i)      Any objection to confirmation of the Plan filed by any Holder of a Claim or Interest could either prevent confirmation of the Plan or delay confirmation for a significant period of time.

(ii)     Since the Debtor may be seeking to obtain approval of the Plan over the rejection of an impaired Class of Claims or Interests, the cramdown process could delay confirmation.

**C.      Conditions Precedent**

Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may never occur.  The Debtor, however, will work diligently with all parties in interest to ensure that all conditions precedent are satisfied.

**D.      Risk Regarding Amounts and Classification of Claims**

The estimated number and amount of Claims in each Plan Class set forth on pages 5 - 8 of this Disclosure Statement are based on the Debtor's review and analysis of its Schedules and the proofs of Claim filed in the Bankruptcy Case, and on the Debtor's assumptions regarding how certain Claims may be classified and treated under the Plan and the Allowed amount of various Disputed Claims.  There can be no assurance that the Debtor's estimates of the number and amount of Claims in each Class, or the Debtor's assumptions regarding the Allowed amount of any specific Disputed Claim, and the concomitant amount of Distributions to the Holder or any Claim in any Class (whether in amount or as a percentage of any Allowed Claim), will prove to be accurate.  The actual Allowed Claim amounts may be different than estimated.

**E.      Competition**

The reorganized Debtor will face competition from a number of other companies, and such competition may result in the loss of existing business or inability to secure future business.  For example, one of the Debtor's former independent contractors has recently started his own security training company and this may negatively impact the Debtor's future security training business.

**F.      Post Confirmation Capital**

Some or all of the new members of the reorganized Debtor will contribute either in the form of a loan or capital contribution sufficient capital in the view of the majority of members of the reorganized Debtor to fund its restarted business operations.  Under the New LLC Agreement, the majority of members in the reorganized Debtor must approve entry into any new financing arrangement or capital call.  Although the Debtor is confident that the New Members of the reorganized Debtor will approve and provide funding necessary to restart the Debtor's business operations and fund any projected growth, there can be no assurance that any such

funding will be available or that such funding will be sufficient to capitalize the reorganized Debtor's business operations.

## G.    **Litigation Risks**

Prior to his death, Kyle owned 850,000 of the 1 million membership units, or 85% of the Debtor. In the State Court Action, Taya claims that she now owns those membership units as Kyle's widow. In the State Court Action, the causes of action alleged by Taya against the non-Debtor defendants are both direct causes of action that she owns, and derivative causes of action that are property of the Estate. With the filing of the Bankruptcy Case and the invocation of the automatic stay, Taya is no longer permitted to pursue those derivative causes of action even if the automatic stay is lifted since they belong to the Debtor. The Debtor is a defendant in the State Court Action only because Taya is seeking a declaratory judgment that sets forth her rights in the Debtor. She requests a declaratory judgment that establishes that she is the owner of Kyle's membership units in the Debtor.

At this point in time, Taya has not alleged a claim against the Debtor in the State Court Action and has not filed a proof of claim in the Bankruptcy Case. If Taya does file a proof of claim in the Bankruptcy Case, it would be contested and opposed by the Debtor.

Furthermore, the Debtor believes Taya no longer owns any Assignee interest in the Debtor. Under the express terms of the Debtor's Amended and Restated Company Agreement (which is binding on Chris's assigns), Taya would have been an Assignee of Chris's interest in the Debtor (as described in §§ 3.6(g) and 3.8 and as defined in the Debtor's Amended and Restated Company Agreement) and not a Member. Unlike a Member, an Assignee has no attendant rights other than to receive a share of distributions. Also, the Debtor exercised its right under § 3.6(b) of the Debtor's Amended and Restated Company Agreement to purchase Taya's asserted Assignee interest at Fair Market Value (as defined in the Debtor's Amended and Restated Company Agreement). Pursuant to § 3.3(b) of the Debtor's Amended and Restated Company Agreement, the Manager of the Debtor delivered a CP Notice to Taya and advised her that the Debtor was exercising its right to repurchase her Assignee interest after Taya had failed to timely fulfill her obligation to provide a CP Notice to the Debtor after Chris's death (a Community Property Event). By letters dated December 6, 2013 and December 16, 2013, the Debtor advised Taya that it was repurchasing her asserted interest under the Debtor's Amended and Restated Company Agreement and, despite the belief that the equity value of membership units was $0, the Debtor offered to pay her an amount equal to the cost to obtain an appraisal ($12,500). Taya declined to accept the $12,500, and the Debtor notified Taya of its selection of an independent appraiser in accordance with the Debtor's Amended and Restated Company Agreement; however, Taya did not exercise her option to appoint a second appraiser. Per the terms of the Debtor's Amended and Restated Company Agreement, Taya was deemed to have consented to the independent appraiser selected by the Debtor, and the independent appraiser's determination of Fair Market Value was final. The independent appraiser hired by the Debtor determined that value of the membership units in the Debtor was $0. In accordance with the Debtor's Amended and Restated Company Agreement, the Debtor paid $0 to Taya in exchange for her asserted Assignee interest in the Debtor. Thus, to the extent Taya ever held any interest in any membership units of the Debtor, Taya no longer retains any such interest in the Debtor.

## X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

Section 1129(a)(7) of the Bankruptcy Code requires that every creditor in an impaired class who has not accepted a proposed plan of reorganization receive at least as much under the plan as that creditor would receive in a hypothetical liquidation of the debtor under chapter 7 of the Bankruptcy Code. That is, each creditor who votes to reject the plan is entitled to be certain that it is no worse off under the plan than it would be if the debtor were liquidated and the proceeds of that liquidation were distributed among all the debtor's creditors in accordance with the distribution priorities established by the Bankruptcy Code. This requirement is generally known as the "best interests of creditors" test.

A liquidation analysis prepared by the Debtor is attached as **Exhibit G**. Nothing in the liquidation analysis will be dispositive of the allowance of any Claims or constitute a waiver by the Debtor of its right to object to any Claim. Unless otherwise provided in the Plan, the Debtor is not stipulating to the validity or amount of any of the Claims set forth in the liquidation analysis. The amount of claims set forth in the liquidation analysis are based upon the proofs of Claim filed as of the date of this Disclosure Statement (including those filed after the Bar Date), as well as amounts reflected on the Debtor's Schedules. The liquidation analysis may be updated as the Debtor continues to analyze the Claims and file objections to Claims. To the extent that confirmation of the Plan requires the establishment of hypothetical amounts for the value of the Debtor and funds available to pay Allowed Claims, the Bankruptcy Court will make those rulings at the Confirmation Hearing. The liquidation analysis values certain assets at the Debtor's cost of goods rather than at the Debtor's estimate of current fair market value as reflected in the Schedules and Statement of Financial Affairs.

The Debtor believes that Holders of all Allowed Claims impaired under the Plan will receive payments or other property under the Plan having a present value as of the Effective Date not less than the amounts such Holders would likely receive if the Debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Thus, the Debtor believes that the Plan satisfies the best interests test as to such Holders. If necessary, the Debtor will seek such a determination from the Bankruptcy Court.

## XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims. This summary does not address all aspects of federal income taxation that may be relevant to all persons considering the Plan. Special federal income tax considerations not discussed in this summary may be applicable to, among other persons, financial institutions, insurance companies, foreign corporations, tax-exempt institutions and persons who are not citizens or residents of the United States. In addition, this summary does not discuss the effect of any foreign, state or local tax law, the effect of which may be significant. Furthermore, this discussion assumes that the Debtor is classified as a limited liability company for U.S. federal income tax purposes.

This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the regulations promulgated thereunder, judicial decisions, and administrative positions of the Internal Revenue Service (the "Service"). All section references in this summary are to sections of the IRC. Any change in the foregoing authorities may be applied retroactively in a manner that could adversely affect persons considering the Plan.

No ruling will be sought from the Service with respect to the federal income tax aspects of the Plan and there can be no assurance that the conclusions set forth in this summary will be accepted by the Service. No opinion has been sought or obtained with respect to the tax aspects of the Plan.

THIS SUMMARY IS INTENDED FOR GENERAL INFORMATION ONLY. PERSONS CONSIDERING THE PLAN ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE REORGANIZATION OF THE DEBTOR, THE RECEIPT OF ANY PAYMENT UNDER THE PLAN, AND THE IMPACT ON THAT PERSON OR ANY OTHER PERSON OF ANY OBLIGATION IMPOSED UNDER THE PLAN. THE DEBTOR MAKES NO REPRESENTATION WITH RESPECT TO THE TAX CONSEQUENCES OF CONFIRMATION OF THE PLAN, OR THE TAX TREATMENT TO HOLDERS OF CLAIMS OR INTERESTS UNDER THE PLAN.

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS in Circular 230, you are hereby informed that (i) any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the IRC, (ii) the advice is written to support the promotion or marketing of the transactions or matters addressed in the Disclosure Statement and (iii) each Holder should seek advice based on its particular circumstances from an independent tax advisor.

## A.     Tax Consequences to the Debtor

Under the IRC, a taxpayer generally must include in gross income the amount of any discharge-of-indebtedness income realized during the taxable year. If, as contemplated under the Plan, the Debtor pays all Allowed Claims, the Debtor will not recognize any discharge-of-indebtedness income pursuant to § 108 of the IRC. If, however, the Debtor is deemed to not have paid all Allowed Claims in full, then the Debtor may be required to realize discharge-of-indebtedness income.

## B.     Tax Consequences To Noteholders

Under the Plan, each General Unsecured Creditor will be allocated new membership units in the Debtor after the Effective Date, unless otherwise provided under the Plan. The amount, character and timing of any gain or loss recognized by each General Unsecured Creditor depends on a variety of factors, including the individual circumstances of such General Unsecured Creditor. Each General Unsecured Creditor should consult with its own tax advisor to determine the impact of the receipt of new membership units in the Debtor.

C.    **Tax Consequences to Holders of Claims**

A Holder of an Allowed Claim who receives Cash or other consideration in satisfaction of any Allowed Claim may recognize ordinary income. Each Holder of a Claim is urged to consult with its tax advisor regarding the tax implications of any Distributions it may receive under the Plan.

D.    **Tax Consequences to Holders of Interests**

Under the Plan, each Holder of an Interest in the Debtor will have that Interest cancelled on the Effective Date, unless otherwise provided under the Plan. The amount, character and timing of any gain or loss recognized by the Holder of any Interest depends on a variety of factors, including the individual circumstances of such Holder. Each Holder of an Interest in the Debtor should consult with its own tax advisor to determine the impact of having its membership units in the Debtor cancelled.

E.    **Information Reporting and Withholding**

All Distributions to Holders of Claims or Interests are subject to any applicable withholding (including employment tax withholding). Under the IRC, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding" then in effect. Backup withholding generally applies if the Holder (1) fails to furnish its social security number or other taxpayer identification number (the "TIN"), (2) furnishes an incorrect TIN, (3) fails properly to report interest or dividends or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE FOREGOING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES THAT MAY BE APPLICABLE UNDER THE PLAN.**

## XII. CONCLUSION

The Debtor urges Holders of Claims to vote to **ACCEPT** the Plan and to evidence such acceptance by returning their ballots so that they will be received by **5:00 p.m. CDST on _____, 2014.**

**CRAFT INTERNATIONAL, LLC**

By:     /s/ Steven Young
Steven Young
Its Chief Executive Officer


REMAINDER OF THIS PAGE INTENTIONALLY BLANK

31

79117v.8