# EXHIBIT E

FILED
DALLAS COUNTY
1/17/2014 5:36:56 PM
GARY FITZSIMMONS
DISTRICT CLERK

## CAUSE NO. DC-13-14996

| | | |
|---|---|---|
| TAYA KYLE | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | 14TH JUDICIAL DISTRICT |
| | § | |
| CRAFT INTERNATIONAL LLC, CRAFT | § | |
| INTERNATIONAL RISK | § | |
| MANAGEMENT, LLC, STEVEN KYLE, | § | |
| AND BO FRENCH, | § | |
| | § | DALLAS COUNTY, TEXAS |
| Defendants. | § | |

## DEFENDANTS' ORIGINAL ANSWER

Defendants Craft International LLC ("Craft" or the "Company"), Craft International Risk

Management, LLC ("CIRM"), Steven Young, and Bo French file this Original Answer and

Affirmative Defenses Plaintiff's Original Petition ("Petition") as follows:

### I.
### Facts Applicable to All Defenses

1.    Plaintiff is not, and never has been, interested in becoming part of a *successful*

Craft. Plaintiff's lawsuit is a character assassination of Craft and its Members in an effort to

eliminate them as a threat to her goal of controlling all things related to Chris Kyle and to rewrite

history. There are two great ironies in Taya Kyle's complaint. The first is that the primary

reason the Craft LLC Agreement excludes her as a Member is because Chris Kyle insisted that

such a provision be inserted due to the discord in his marriage and his belief that divorce was a

very real possibility. In the event of divorce or his death, Chris did not want Taya to have any

involvement in Craft aside from being cashed out at fair market value. The second is that

Plaintiff has sued and maligned Young and French to further her goals when they helped Chris

on a daily basis as he wrestled with post-traumatic stress disorder, worked to help him write and

DEFENDANTS' ORIGINAL ANSWER                                    PAGE - 1

promote his books and make other appearances, spent countless hours trying to make Craft a success, and raised hundreds of thousands of dollars to support Plaintiff and her children when Chris died.

2.      Craft was created with the financial support of investors who recognized Chris Kyle as an American hero long before he published his book, "American Sniper." Those investors believed that with the combination of their financial backing, Chris's experiences, and the business skills of individuals like Steven Young, Craft could be a successful enterprise specializing in military and paramilitary training. But no one, including Chris Kyle, suffered from any delusion that Chris had the business acumen to make Craft work.

3.      The investors loaned Craft approximately $1.9 million in the form of convertible notes to get the Company off the ground and allow it to meet its start-up costs, including salaries for Chris Kyle and others.

4.      Young was one of the founding Members of Craft. It was Young who, with Chris Kyle's input, designed the Craft logo. Plaintiff concedes at paragraph 19 of her Petition that the Company owns that Craft logo. Chris Kyle also approved of Craft's use of his image and references to his incredible accomplishments in its marketing materials, and he personally supplied those items to Craft for that purpose. Chris proudly wore Craft apparel when he made public appearances because he wanted people to make the connection between the Craft and himself.

5.      Nevertheless, in September 2013, Plaintiff sought to completely divest herself of any interest in Craft *if* Craft would surrender its logo and other intellectual property to her and completely divorce itself from Chris Kyle's legacy by eliminating all written or pictorial references to him. Plaintiff even demanded that Craft publish a statement that there is no

connection between it and Chris Kyle. In short, Plaintiff communicated that she wanted nothing to do with Craft, and that she wanted to foster the absurd impression that Chris Kyle had never had anything to do with Craft.

6.      Chris Kyle was killed in February 2013. Following his death, Craft's Members discussed with Plaintiff their willingness to make her a Member in the Company. Although they had no legal obligation to do so, Craft's Members provided Plaintiff with detailed source information regarding the status and prospects of the business. For example, in March 2013, Plaintiff and her designated representative were given unrestricted access to, and reviewed all of, Craft's books and financial records. In May 2013, Plaintiff attended a meeting of Craft's officers and largest investors, where the Company's financial standing was again laid out before her and discussed in detail with her. She knew for example, that Craft had not repaid any of the convertible notes, that the Company was running a deficit, and that Chris Kyle, Young and French had not been paid a salary since August of 2012.

7.      During his lifetime, Chris Kyle took Craft's obligations to repay its investors very seriously, and he stated unequivocally his intent make Craft a success so that it could fully repay the convertible notes. Like Young and French, he, too, had worked for nearly six months without a salary in order to make good on that promise. Young and French have still not taken salaries since that time.

8.      Plaintiff took a dramatically different view. At the May 2013 meeting, Plaintiff expressly stated her belief that the investors in Craft need not be repaid. Of the $1.9 million raised from investors, over $325,000 had been paid in salary and benefits to Chris Kyle alone. Though Plaintiff and her family were direct beneficiaries of these funds, she believed Craft had

no obligation to see that investment repaid. Chris Kyle was a man of his word and would never have taken that position.

9.     Many of those same Craft investors and officers had, in the months preceding the May meeting, created the Chris Kyle Memorial Trust and raised $300,000 dollars to support the Kyle family after the February 2013 tragedy. Young and French had even created a special line of items through Craft with all profits, totaling approximately $100,000, going to the Kyle and Littlefield families. Young, French and others also worked to assist and facilitate the countless other big-hearted people seeking to raise funds for the Kyle and Littlefield families. Nevertheless, Plaintiff still saw no legal or moral obligation to make any effort to repay the notes.

10.     Plaintiff's disregard for Craft was summed up in a demand she made to the Company in September 2013 (the "Demand"). The Demand insisted, among other things, that Craft immediately cease using any images or references to Chris Kyle, that it no longer use any materials that would imply any past connection between Craft and Chris, that it stop using any designs or other works that Chris Kyle created or co-created, and that it publish a public written statement to the effect that there is no longer any business or personal relationship between Craft and either Plaintiff or Chris Kyle. In short, Plaintiff wanted to rewrite history.

11.     When Plaintiff made her Demand, she knew that if Craft met the terms of that Demand, its ability to continue as a going concern would be severely hampered. That Demand was not only legally unfounded, it was offensive to all those who had done so much to support Chris Kyle and Craft, and it was a rejection of Chris's commitment to Craft. It was obvious to Young and French that Plaintiff had no desire to join Craft and make it a success; rather, Plaintiff's focus was on killing Craft.

12.     Craft properly responded to Plaintiff's Demand by resorting to the processes set forth in the Amended and Restated Company Agreement of Craft International LLC (the "Agreement"). That Agreement governs the Company and the rights of its Members and their spouses.

13.     At the time of Chris Kyle's death, the Members of the Company were Chris Kyle, Steven Young, and Bo French.

14.     The Agreement specifically contemplates the possibility of a Community Property Event, which includes the death or divorce of a Member.

15.     All of the Members, and especially Chris Kyle, agreed that, in the event of a Community Property Event, their respective spouses would not become Members, but would instead be cashed out at the fair market value of the Member's interest in the Company – a very customary provision in closely-held companies. That understanding is set forth, *inter alia*, in Articles 3 and 4, including the following language:

> Any spouse of a Member who obtains Units pursuant to a Community Property Event shall be treated as a transferee, *shall not be admitted to the Company* as a Substitute Member, and shall not have the management rights and/or approval rights, as appropriate, of a Member under this Agreement, including the right to vote on Company actions. (emphasis added)

16.     Upon proper notice of a Community Property Event, the Agreement provides for the Company or its Members to purchase an affected Member's interest at Fair Market Value. That purchase process is triggered *when the Company receives written notice of a Community Property Event*, as set forth in Article 3.6:

> Each individual Member agrees to notify the Company in writing promptly, and in any event not later than ten (10) days after the occurrence of a Community Property Event with respect to him/her (the "CP Notice") (the date upon which such CP Notice is received being the "CP Notice Date").

DEFENDANTS' ORIGINAL ANSWER                                                  PAGE - 5

17.     Neither Plaintiff nor any representative of Chris Kyle's estate gave the required written notice.  Plaintiff fails to even *allege* that the required notice was given because she knows full well it did not happen.  Plaintiff, instead, relies merely on the date of Chris Kyle's death.  But the Agreement is clear that it is not the date of *the event* that triggers certain deadlines, but rather the date on which Craft receives the *written notice of the event. See* Agreement at Article 3.6(a).  This distinction is critical, not because Craft's Members needed to be reminded of Chris's death, but rather because it would put them on notice that Plaintiff was formally initiating certain processes under the LLC Agreement.

18.     Plaintiff complains that the closing of the purchase transaction did not occur within a proscribed time, but she fails to acknowledge that she is at fault for properly and timely initiating that process.

19.     In December 2013, Chris Kyle had been deceased for ten months and Plaintiff had expressed her unequivocal desire to separate from Craft.  Consequently, though Craft had not received the required notice, Craft sent to Plaintiff its own notice that it was exercising its right to purchase Chris Kyle's interest in the Company.  A true and correct copy of that letter is attached hereto as **Exhibit A**.

20.     Under the LLC Agreement, Plaintiff then had two choices.  She could either accept the offer made by Craft, or she could force Craft into an appraisal process.  She elected the latter. *See* Agreement at Article 1.1, definition of Fair Market Value.

21.     On December 16, 2013, Craft nominated an independent third-party appraiser to value the entity consistent with the terms of the LLC Agreement. **Exhibit B.**  At that point, Plaintiff could have nominated her own appraiser within five days, and then those two appraisers would select a third:

If the parties cannot agree on the fair market value, an independent appraiser selected by the two (2) parties, whose determination of the fair market value of the Unites shall be final. If the two (2) parties cannot agree on an appraiser, within five (5) days of their failure to agree, each group shall appoint one (1) appraiser, the two (2) of them shall thereupon appoint a third (3rd) independent appraiser. *If either of the parties fail to appoint an appraiser within the five (5)-day period, it shall be deemed to have consented to the appraiser selected by the other party and that appraiser's determination of the fair market value shall be final. (Id.,* emphasis added)

22.     Plaintiff waived her right to appoint her own appraiser.   Instead, she merely gave notice through her lawyer of her "objection" to Craft's nominated appraiser.   Under the LLC Agreement, that mere objection was without meaning or effect.

23.     Plaintiff did not want an appraisal done because she already knew what it would show and merely wanted to delay and obstruct the appraisal process.   After she had knowingly waived her right to have her own appraiser involved in the process, she filed the present lawsuit making outrageous claims and personal attacks.   One of those claims is that Plaintiff was denied access to the books and records of the Company, which ignores the fact that the independent appraiser would have such access and would be far more qualified than the Plaintiff to evaluate those materials.   Since the Plaintiff refused to participate in the appraiser selection process, this complaint is a hollow one.

24.     The appraisal was concluded on January 6, 2014, and Craft is prepared to pay Plaintiff 85% of the Fair Market Value as determined by that valuation.

25.     Simultaneously, the same appraiser conducted an appraisal of CIRM, though there was no requirement that CIRM undergo an appraisal at that time.

26.     In short, the offer that Craft made to Plaintiff is greater than the Fair Market Value, as the officers believed it would be when an offer was made to Plaintiff on December 6, 2013.

DEFENDANTS' ORIGINAL ANSWER                                                      PAGE - 7

27.     Plaintiff has also brought into this lawsuit CIRM.   As is the case for Craft, Plaintiff has no standing to make any claim against that entity because she is not a Member.   An important distinction, however, is that even Chris Kyle was *never* a Member of CIRM because he expressly chose not to be.

28.     ~~CIRM was created with a different mission that Craft, and all of those involved~~ with Craft, including Chris Kyle, recognized that an ownership interest by him could be detrimental to that mission.

29.     Craft is not, and never had been, the manager of CIRM, as Plaintiff alleges.

30.     Contrary to Plaintiff's assertions, CIRM was created with Chris Kyle's complete knowledge and approval.   In fact, Kyle was even involved in the naming of that entity, as is shown by the email attached hereto as **Exhibit C.**

31.     CIRM was founded in mid-2011 and operated for a year and a half before Kyle's death.   In that time, Kyle sat in on many meetings regarding CIRM and was fully apprised of its activities.   Therefore, Plaintiff's assertions about CIRM's founding, and about Young and French with regard to CIRM, are patently false.

## II.
## General Denial

32.     Defendants deny all allegations contained in Plaintiff's Petition, together with any supplement or amendment thereto, and demands strict proof thereof to the degree required by the laws of the State of Texas.

## III.
## Special Exceptions

33.     Defendants specially except to Plaintiff's cause of action for Fraud, at paragraphs 53-56 of the Petition, because the allegations of fraud are not pled with the particularity required by Texas law.   In addition, Plaintiff has failed to identify the conduct attributed to each of the multiple Defendants, and instead has merely grouped them together for pleading purposes.

## IV.
## Verified Denials

34.     Defendants deny that Plaintiff has the legal capacity to sue, or is not entitled to recover in the capacity in which she sues, because Plaintiff is not a Member of Craft.

35.     Defendants deny that Plaintiff has the legal capacity to sue, or is not entitled to recover in the capacity in which she sues, because Plaintiff is not a Member of CIRM.

## V.
## Special and Affirmative Defenses

36.     Plaintiff fails to state a claim upon which relief can be granted.

37.     Plaintiff's claims are barred, in whole or in part, by waiver.

38.     Plaintiff's claims are barred, in whole or in part, by laches.

39.     Defendant specifically denies any allegations of fraud, malice, gross negligence, and other conduct which may form the legal basis for entitlement to exemplary or punitive damages.

40.     Defendant specifically denies that the harm with respect to which Plaintiff seeks recovery of exemplary or punitive damages resulted from any knowing or willful act or omission.

DEFENDANTS' ORIGINAL ANSWER                                                              PAGE - 9

41.    Defendant affirmatively pleads that Plaintiff's claims for damages are subject to the caps prescribed by Tex. Civ. Prac. & Rem. Code §41.001 et seq., and all other applicable statutory caps on damages.

## VI.
### Prayer

Defendants respectfully request judgment in their favor on Plaintiff's claims, together with their costs and all other relief to which they are justly entitled. Defendants further request an award of their costs and their reasonable and necessary attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code § 37.009, or as otherwise allowed by law.

Respectfully submitted,

By: /s/ John W. Lilley III
John W. Lilley III
Texas Bar No. 12354950
David C. Schick
Texas Bar No. 017745700
**SUMNER, SCHICK & PACE, L.L.P.**
3811 Turtle Creek Blvd, Suite 600
Dallas, TX 75219
Telephone: (214) 965-9229
Facsimile: (214) 965-9215
Email:  jlilley@sumnershick.com
dschick@sumnershick.com

**COUNSEL FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I, the undersigned, certify that on January 17, 2014, the foregoing document was served on the following through the Court's electronic notification system:

Lawrence J. Friedman
Friedman & Feiger
5301 Spring Valley Rd., Suite 200
Dallas, TX 75254

/s/ John W. Lilley III
John W. Lilley III

CAUSE NO. DC-13-14996

| | | |
|---|---|---|
| TAYA KYLE | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | 14TH JUDICIAL DISTRICT |

TAYA KYLE                                          §        IN THE DISTRICT COURT
                                                   §
        Plaintiff,                                 §
                                                   §
vs.                                                §        14TH JUDICIAL DISTRICT
                                                   §
~~CRAFT INTERNATIONAL LLC, CRAFT~~                 §
INTERNATIONAL RISK                                 §
MANAGEMENT, LLC, STEVEN KYLE,                      §
AND BO FRENCH,                                     §
                                                   §        DALLAS COUNTY, TEXAS
        Defendants.                                §

## VERIFICATION

STATE OF TEXAS            §
                         §
COUNTY OF DALLAS          §

Before me, the undersigned notary, appeared Bo French, who on his oath deposed and stated as follows:

My name is Bo French. I have reviewed Defendants' Original Answer. The allegations contained in paragraphs 34 and 35 therein are within my personal knowledge and are true and correct.

_____
Bo French

Subscribed and sworn to before me on the _17th_ day of January, 2014, to certify which witness my hand and official seal.

*M. Carmen Cindo*

_____
Notary Public in and for
The State of _Texas_
Commission Expires: _September 9, 2016_

M. CARMEN CINDO
Notary Public, State of Texas
My Commission Expires
September 09, 2016



December 6, 2013

*Via Email and Certified Mail, Return Receipt Requested*
Taya Kyle
5611 Mulberry Ln
Midlothian, TX 76065
*tayakyle@yahoo.com*

Dear Taya:

We understand from your recent communications that you believe the time is right for us to sever our business ties. On a personal level, we will always consider you and the children to be like family to us, but we agree that it is appropriate to end our business relationship. The Craft International LLC Agreement provides for Community Property Events such as Chris's death. In particular, it allows the remaining Members of the LLC, or the LLC, itself, to purchase Chris's Units from his spouse, estate, or heirs at their Fair Market Value. Given that no Member has done so within the time allowed by the Agreement, the LLC now elects to exercise that right.

The LLC is currently indebted on convertible notes in the amount of approximately $2.2 million. Furthermore, the LLC is in a negative cash flow position, and the principals have worked without a salary since August 2012. I'm aware that none of this is news to you, since we have repeatedly opened our doors and accounting records to you and your designees on many occasions. I wish it was not the case, but because of the position the LLC finds itself in, the Fair Market Value of Chris's Units is zero.

Though it is within the LLC's right to purchase Chris's Units at their Fair Market Value, the LLC instead offers you $12,500.00 for them. We have arrived at that figure because we obtained a quote from a business valuation firm to conduct a valuation at that price. Rather than bear that expense only to be told the inevitable, we would rather offer that amount to you. If you agree to accept the offer, please indicate by signing below and returning this to my attention on or before December 15, 2013, at which point this offer expires, and we will move forward with the valuation process.

EXHIBIT

tabbies

A

**CRAFT**
INTERNATIONAL LLC

I look forward to hearing from you and, as always, wish you all the best.

Sincerely,

Steven Young
Chief Executive Officer

Agreed: _____
        Taya Kyle

# SUMNER, SCHICK & PACE, LLP

TURTLE CREEK CENTRE
3811 TURTLE CREEK BLVD.
SUITE 600
DALLAS, TEXAS 75219

PHONE (214) 965-9229
FACSIMILE (214) 965-9215

December 16, 2013

*Via Email and Certified Mail, Return Receipt Requested*

Lawrence J. Friedman
Friedman & Fleiger
5301 Spring Valley Rd., Suite 200
Dallas, TX 75254
*LFriedman@fflawoffice.com*

Dear Mr. Friedman:

I represent Craft International LLC, and have been asked to respond to your letter of December 13. Craft declines your invitation to extend its offer. Given that Taya Kyle did not timely accept Craft's offer to purchase Chris Kyle's Units for $12,500, Craft is proceeding with the valuation process. In that regard, Craft nominates Hill Johnson of Hartman, Leito & Bolt as the independent appraiser. You can review his qualifications at http://hlbllp.com/leadership/hill-johnson-asa. If Ms. Kyle does not agree to use Mr. Johnson as the independent appraiser, please provide the name and contact information of her designated appraiser within five days.

Ms. Kyle has no rights to inspect the books and records of the LLC pursuant to the statutes you sighted. Those statutes apply only in the absence of an LLC agreement to the contrary. Here, the Craft International LLC Agreement is clear that Ms. Kyle's rights do not include those set forth in the Texas Business Organizations Code or those provided to a Substitute Member under the Agreement. As a courtesy, Craft allowed Ms. Kyle access on multiple occasions this year, including March 7 and May 6, 2013. We reject your demand to further inspect on December 18.

Sincerely,

John W. Lilley III



EXHIBIT
B

| | |
|---|---|
| **From:** | Chris Kyle <ckyle@thecraft.com> |
| **Sent:** | Thursday, July 28, 2011 7:45 PM |
| **To:** | Steven Young |
| **Subject:** | RE: Names |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Risk management

-----Original Message-----
From: Steven Young
Sent: Thursday, July 28, 2011 7:43 PM
Cc: Chris Kyle; Rob Dunbar
Subject: Names

Pick one:
Craft International Security Services
Craft International Risk Management

Craft iPhone



1