# EXHIBIT 2

# AMENDED AND RESTATED

# COMPANY AGREEMENT

## OF

# CRAFT INTERNATIONAL LLC

### (A Texas Limited Liability Company)

THE UNITS REFERENCED HEREIN HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. WITHOUT REGISTRATION, THESE SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, EXCEPT ON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGERS OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR THE SUBMISSION TO THE MANAGERS OF THE COMPANY OF OTHER EVIDENCE SATISFACTORY TO THE MANAGERS TO THE EFFECT THAT ANY TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATIONS PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF UNITS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THIS COMPANY AGREEMENT.

# AMENDED AND RESTATED

## COMPANY AGREEMENT

### OF

## CRAFT INTERNATIONAL LLC

### (A Texas Limited Liability Company)

TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| 1.1. | Definitions | 1 |
| 1.2. | Other Definitional Provisions | 8 |
| | | |
| ARTICLE 2 | FORMATION | 8 |
| 2.1. | Name and Formation | 8 |
| 2.2. | Principal Place of Business | 8 |
| 2.3. | Registered Office and Agent | 8 |
| 2.4. | Duration | 8 |
| 2.5. | Purposes and Powers | 8 |
| 2.6. | Foreign Qualification | 8 |
| 2.7. | No State-Law Partnership | 8 |
| | | |
| ARTICLE 3 | MEMBERSHIP | 9 |
| 3.1. | Members | 9 |
| 3.2. | Additional Members | 9 |
| 3.3. | Transfer Restriction | 9 |
| 3.4. | Right of First Refusal | 9 |
| 3.5. | Redemption Right | 11 |
| 3.6. | Community Property | 11 |
| 3.7. | Substitute Member | 12 |
| 3.8. | Assignee's Rights | 12 |
| 3.9. | Tax Matters | 12 |
| 3.10. | Information | 13 |
| 3.11. | Lack of Authority | 13 |
| 3.12. | Liability to Third Parties | 13 |
| 3.13. | Withdrawal | 13 |
| 3.14. | Certificates | 13 |
| | | |
| ARTICLE 4 | MEETINGS OF MEMBERS | 14 |
| 4.1. | Place | 14 |
| 4.2. | Annual Meetings | 14 |
| 4.3. | Special Meetings | 14 |
| 4.4. | Notice | 14 |
| 4.5. | Quorum | 14 |
| 4.6. | General Voting Procedures | 14 |
| 4.7. | List of Members Entitled to Vote | 15 |

i

| | | |
|---|---|---:|
| 4.8. | Registered Members | 15 |
| 4.9. | Actions Without a Meeting and Telephonic Meetings | 15 |
| | | |
| ARTICLE 5 | RIGHTS AND DUTIES OF MANAGERS | 16 |
| 5.1. | Management | 16 |
| 5.2. | Number and Qualifications | 16 |
| 5.3. | Election | 16 |
| 5.4. | Vacancy | 16 |
| 5.5. | Removal | 16 |
| 5.6. | Place of Meetings | 16 |
| 5.7. | Annual Meetings | 16 |
| 5.8. | Regular Meetings | 16 |
| 5.9. | Special Meetings | 16 |
| 5.10. | Quorum | 16 |
| 5.11. | Attendance and Waiver of Notice | 17 |
| 5.12. | Compensation | 17 |
| 5.13. | Officers | 17 |
| 5.14. | Indemnification | 17 |
| 5.15. | Actions Without a Meeting and Telephone Meetings | 18 |
| | | |
| ARTICLE 6 | CAPITALIZATION | 18 |
| 6.1. | Capital Contributions | 18 |
| 6.2. | Member Loans | 18 |
| 6.3. | Capital Accounts | 19 |
| 6.4. | Withdrawal or Reduction of Capital Contributions | 19 |
| 6.5. | Units | 19 |
| 6.6. | Liability of Members | 20 |
| 6.7. | Preemptive Rights | 20 |
| | | |
| ARTICLE 7 | ALLOCATIONS AND DISTRIBUTIONS | 20 |
| 7.1. | Distributions of Distributable Cash | 20 |
| 7.2. | Basic Allocations | 20 |
| 7.3. | Allocations on Transfers | 21 |
| 7.4. | Special Allocations | 21 |
| 7.5. | Curative Allocations | 22 |
| 7.6. | Built-in Allocations | 22 |
| 7.7. | Regulatory Compliance | 23 |
| 7.8. | Limitations Upon Distributions | 23 |
| | | |
| ARTICLE 8 | BOOKS AND ACCOUNTS | 23 |
| 8.1. | Accounting Principles | 23 |
| 8.2. | Records and Reports | 23 |
| 8.3. | Tax Returns and Other Elections | 24 |
| 8.4. | Tax Matters Partner | 24 |
| 8.5. | Bank Accounts | 24 |
| | | |
| ARTICLE 9 | WINDING-UP AND TERMINATION | 24 |
| 9.1. | Events Requiring Winding-up | 24 |
| 9.2. | Process of Winding-up | 25 |
| 9.3. | Distribution of Assets on Winding-up | 25 |
| 9.4. | Distributions in Kind | 25 |

| | | |
|---|---|---|
| 9.5. | Certificate of Termination | 25 |
| ARTICLE 10 | MISCELLANEOUS PROVISIONS | 26 |
| 10.1. | Notices | 26 |
| 10.2. | Amendments | 26 |
| 10.3. | Application of Texas Law | 26 |
| 10.4. | No Action for Partition | 26 |
| 10.5. | Headings and Sections | 27 |
| 10.6. | Number and Gender | 27 |
| 10.7. | Binding Effect | 27 |
| 10.8. | No Third-Party Beneficiary | 27 |
| 10.9. | Sole and Absolute Discretion | 27 |
| 10.10. | Title to Company Property | 27 |
| 10.11. | Severability | 27 |
| 10.12. | Counterparts | 27 |
| 10.13. | Entire Agreement | 27 |
| 10.14. | Acknowledgment | 27 |

Attachment:      Exhibit A
                        Exhibit B
                        Exhibit C

# AMENDED AND RESTATED

# COMPANY AGREEMENT

# OF

# CRAFT INTERNATIONAL LLC

## (A Texas Limited Liability Company)

THIS AMENDED AND RESTATED COMPANY AGREEMENT, dated the 1st day of July, 2011, is hereby duly adopted as the company agreement of Craft International LLC, a Texas limited liability company, by the Manager, and ratified, confirmed, and approved as such by the Members.

## ARTICLE 1

## DEFINITIONS

1.1. **Definitions**. The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

"*Accountant*" means the certified public accountant or firm of certified public accountants, if any, selected by the Members to perform accounting functions on behalf of the Company.

"*Adjusted Capital Account Deficit*" means with respect to any Member, the deficit balance, if any, in the Capital Account of that Member as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 6.3 and further adjusted as follows: (i) credit to such Capital Account, any amounts which that Member is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to such Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6); and (iii) to the extent required under the Treasury Regulations, credit to such Capital Account (A) that Member's share of "minimum gain" and (B) that Member's share of "partner nonrecourse debt minimum gain." (Each Member's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively).

"*Advancement of Expenses*" has the meaning set forth in Section 5.14(b).

"*Agreement*" means this Amended and Restated Company Agreement of the Company as adopted and as amended from time to time.

"*Approval of a Majority of the Members*" or "*Approved by a Majority of the Members*" means, with respect to any referenced group of Members, a combination of any of such Members who, in the aggregate, own more than fifty percent (50%) of the Units owned by all of such referenced group of Members.

"*Approval of a Super Majority of the Members*" or "*Approved by a Super Majority of the Members*" means the Members who, in the aggregate, own more than sixty-seven percent (67%) of the Units owned by all of the Members.

"*Assignee*" means a transferee of all or any portion of a Member's or any other transferor's Units.

"*Bankruptcy*" means, with respect to any Member, that Member's taking or acquiescing in the taking of an action seeking relief under, or advantage of, any applicable debtor relief, liquidation, receivership, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, reorganization, or similar law affecting the rights or remedies of creditors generally, as in effect from time to time.

"*Business Day*" means a day other than a Saturday, Sunday, or other day that is a nationally recognized holiday.

"*Capital Account*" means, with respect to any Member, the account maintained for such Member in a manner that the Managers determine is in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv), and Section 6.3.

"*Capital Contribution*" means any contribution to the capital of the Company in cash or property by a Member whenever made.

"*Certificate*" means Certificate of Formation of the Company that was filed with the Secretary of State of the State of Texas.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Company*" means Craft International LLC, a Texas limited liability company.

"*Company Legal Matter*" has the meaning set forth in Section 10.14.

"*Community Property Event*" means, with respect to any Member who is an individual, any event (including, without limitation, events related to death of a spouse or divorce of a Member) that results in that Member no longer having full and exclusive voting and investment power with respect to his/her Membership Interest.

"*Convertible Notes*" means those certain 12% Convertible Preferred Notes, in the aggregate principal amount of $1,897,329, in the form attached hereto as Exhibit B.

"*CP Closing*" has the meaning set forth in Section 3.6(d).

"*CP Member*" has the meaning set forth in Section 3.6(a).

"*CP Notice*" has the meaning set forth in Section 3.6(a).

"*CP Notice Date*" has the meaning set forth in Section 3.6(a).

"*CP Purchase Price*" has the meaning set forth in Section 3.6(c).

"*CP Spouse*" has the meaning set forth in Section 3.6(a).

"*CP Units*" has the meaning set forth in Section 3.6(a).

"*Depreciation*" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or any other cost recovery deduction allowable with respect to an asset for that year or other period, except that if the Gross Asset Value of an asset differs from its tax basis at the

beginning of the year or other period, depreciation shall be an amount that bears the same ratio to the beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for the year or other period bears to the beginning tax basis, except that, if the federal income tax depreciation, amortization, or other cost recovery deduction for that year or other period is zero, depreciation shall be determined with reference to the beginning Gross Asset Value, using any reasonable method selected by the tax matters partner.

"*Distributable Cash*" means all cash, revenues, and funds received by the Company from the Company's operations, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operations of the Company's business; and (iii) such cash reserves as the Managers deem reasonably necessary to the proper operation of the Company's business.

"*Entity*" means any joint venture, general partnership, limited partnership, limited liability company, corporation, trust, business trust, cooperative, association, or other incorporated or unincorporated entity.

"*Employment Agreement*" means, with respect to each Founder, that certain Employment Agreement entered into between the Company and that Founder.

"*Fair Market Value*" means the fair market value of the Units as determined by an agreement between the two (2) parties involved in the relevant transaction. If the parties cannot agree on the fair market value, an independent appraiser selected by the two (2) parties, whose determination of the fair market value of the Units shall be final. If the two (2) parties cannot agree on an appraiser, within five (5) days of their failure to agree, each group shall appoint one (1) appraiser, the two (2) of whom shall thereupon appoint a third (3rd) independent appraiser, within seven (7) days of the appointment of the second appraiser. If either of the parties fail to appoint an appraiser within the five (5)-day period, it shall be deemed to have consented to the appraiser selected by the other party and that appraiser's determination of the fair market value shall be final. Once three (3) appraisers are appointed, each appraiser shall determine the fair market value. The fair market value shall be the average of the middle value (*i.e.*, the amount determined by the appraiser that is neither the highest nor the lowest) and the value that is closest to the middle value; *provided, however*, if there is an equal difference between the middle value and the other two values, the fair market value shall be the middle value; *provided, further*, if two of the values are equal, the fair market value shall be the amount agreed-upon by those two appraisers. For example, if the three values were $9, $10, and $12, the fair market value would be $9.50; if the three values were $9, $10, and $11, the fair market value would be $10; and if the three values were $9, $9, and $12, the fair market value would be $9. Such appraiser or appraisers shall, as a condition of their employment, execute agreements to keep any information they receive concerning the Company confidential. The expenses of such appraisal shall be borne equally by the two (2) parties. Notwithstanding anything in this Agreement to the contrary, the Fair Market Value of Units shall be determined on the basis that the Units being Transferred may be Transferred only in accordance with the terms of this Agreement and that no Person owning the Units has the right to withdraw the Units or any value or assets attributable thereto from the Company or cause the Company to dissolve and liquidate before the end of the term of the Company. Therefore, the Fair Market Value of any Units shall be further determined under the assumption that the only distributions that will be made to the owner of the Units will be the Units' proportionate share of the cash distributions of the Company that are distributed to the Members from time to time and the Units' proportionate share of the property when the Company terminates, subject to any appropriate minority interest, lack of marketability and other applicable discounts

"*Fiscal Year*" means the Company's fiscal year, which shall begin on January 1st and end on December 31st.

"*Founders*" means Chris Kyle, Mark Spicer, Steven Young, and R.W. Bo French.

"*Gross Asset Value*" means, with respect to any asset, the tax basis of that asset, except as follows:

(i) The initial Gross Asset Value of any asset contributed (or deemed contributed under Code Sections 704(b) and 752 and the Treasury Regulations promulgated thereunder) by a Member to the Company shall be the fair market value of the asset on the date of the contribution, as determined by the contributing Member and the Managers.

(ii) The Gross Asset Values of all Company assets shall be adjusted to equal their respective fair market values, as determined by the Managers as of the following times: (A) the acquisition of an additional interest in the Company by any Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an interest in the Company; and (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); *provided, however*, that adjustments pursuant to clauses (A) and (B) above shall be made only if the Managers reasonably determine that the adjustments are necessary or appropriate to reflect the relative economic interests of the Members;

(iii) The Gross Asset Value of any Company asset distributed to any Member shall be the fair market value of the asset on the date of distribution; and

(iv) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the tax basis of the assets pursuant to Code Sections 734(b) or 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided, however*, that Gross Asset Values shall not be adjusted pursuant to this paragraph (iv), to the extent the Managers determine that an adjustment pursuant to paragraph (ii) is necessary or appropriate in connection with a transaction that would otherwise result in adjustment pursuant to this paragraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraphs (i), (ii), or (iv) above, that Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to the asset for purposes of computing Profits and Losses.

"*Indemnitee*" has the meaning set forth in Section 5.14(a).

"*Legal Counsel*" has the meaning set forth in Section 10.14.

"*Majority*" means, with respect to any referenced group of Managers, a combination of any of such Managers constituting more than fifty percent (50%) of the number of Managers of such referenced group who are then elected and qualified.

"*Manager*" means each Person designated as a Manager on Exhibit A, or any other Person or Persons that succeed such Person or Persons in that capacity or are elected to act as additional Managers of the Company as provided herein.

"*Maximum Lawful Rate*" means the maximum, lawful, non-usurious rate that may be charged, collected, or received on a particular loan under applicable laws.

"*Member*" means each Person designated as a member on Exhibit A, any successor or successors to all or any part of any such Person's Membership Interest, or any other Person admitted as a member of the Company pursuant to this Agreement, each in the capacity as a member of the Company.

"*Member Loans*" has the meaning set forth in Section 6.2.

"*Membership Interest*" means, with respect to any Member at any time, the entire equity interest (or "*membership interest*" as that term is used in TBOC) of a Member in the Company and all rights and liabilities associated therewith, including that Member's Units.

"*New Units*" means any Units issued by the Company after the date of this Agreement.

"*Non-Founders*" means (i) any Member other than the Founders and (ii) for so long as the Convertible Notes are issued and outstanding, the holders of such Convertible Notes.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Offered Units*" has the meaning set forth in Section 3.4.

"*Partially Adjusted Capital Accounts*" means, with respect to any Member for any Fiscal Year, the Capital Account of such Member at the beginning of such year, adjusted for all Capital Contributions and distributions during such year and all special allocations pursuant to Sections 7.4 and 7.5 with respect to such year before giving effect to any allocations of Profit or Loss pursuant to Section 7.2(a).

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Person*" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of that Person where the context so admits.

"*Preemptive Right*" has the meaning set forth in Section 6.7.

"*Preemptive Right Notice*" has the meaning set forth in Section 6.7.

"*Prime Rate*" means the rate of interest per annum stated from time to time in The Wall Street Journal (or any successor publication thereto) as the base rate on corporate loans for at least seventy-five percent (75%) of the thirty (30) largest banks in the United States.

"*Proceeding*" has the meaning set forth in Section 5.14(a).

"*Profits*" and "*Losses*" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(iii)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of "Depreciation;"

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii)     Notwithstanding any other provision of this definition of "Profits" and "Losses," any items that are specially allocated pursuant to Section 7.4 or Section 7.5 shall not be taken into account in computing Profits or Losses.

"*Property*" means all of the assets of the Company.

"*Pro Rata*" means the ratio determined by dividing the Units of Members to whom a particular provision of this Agreement is stated to apply by the aggregate of the Units of all Members to whom that provision is stated to apply. For purposes of determining Pro Rata for the holders of the

Convertible Notes at any point in time, each holder shall be deemed to hold the number of Units he/it will own upon the conversion of the Convertible Notes to Units, at that time.

"*Redemption Event*" has the meaning set forth in Section 3.5.

"*Redemption Price*" has the meaning set forth in Section 3.5.

"*Redeemed Units*" has the meaning set forth in Section 3.5.

"*Remaining CP Units*" has the meaning set forth in Section 3.6(c).

"*Remaining Units*" has the meaning set forth in Section 3.4(b).

"*Seller*" has the meaning set forth in Section 3.4

"*Substitute Member*" has the meaning set forth in Section 3.7.

"*Targeted Accounts*" means, with respect to any Member for any Fiscal Year, an amount (either positive or negative) equal to the hypothetical distribution such Member would receive, or hypothetical contribution such Member would be required to make, as the case may be, if: (i) all Company assets, including cash, were sold for cash at an aggregate price equal to their Gross Asset Value (taking into account any adjustments to Gross Asset Value for such Fiscal Year), (ii) all liabilities allocable to such assets were then satisfied according to their terms (limited, with respect to each Nonrecourse Liability, to the Gross Asset Value of the assets securing such liability), and (iii) all such proceeds from the disposition were distributed pursuant to Section 7.1, reduced by such Member's share of Partner Nonrecourse Debt Minimum Gain and Partnership Minimum Gain immediately prior to such sale.

"*TBOC*" means the Texas Limited Liability Company Law, Title 3 of the Texas Business Organization Code, as the same may be amended from time to time.

"*Transfer*" or derivations thereof, of an interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation, or other disposition of a Membership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily to transfer, sell, assign, exchange, pledge, hypothecate, or otherwise dispose of.

"*Transfer Amount*" has the meaning set forth in Section 3.4.

"*Transfer Notice*" has the meaning set forth in Section 3.4.

"*Transfer Notice Date*" has the meaning set forth in Section 3.4.

"*Treasury Regulations*" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"*Units*" means equal units of economic interest of all Members, and all rights and liabilities associated therewith, at any particular time, including, without limitation, rights to distributions (liquidating or otherwise) and allocations.

1.2.    **Other Definitional Provisions.** All terms used in this Agreement that are not defined in this Article 1 have the meanings contained elsewhere in this Agreement. Defined terms used herein in the singular shall import the plural and vice versa.

## ARTICLE 2

## FORMATION

2.1.    **Name and Formation.** The name of the Company is "Craft International LLC." All business of the Company must be conducted in that name or in one or more other names that comply with applicable law and that are selected by the Managers from time to time. The Company was formed as a limited liability company upon the issuance of the Certificate of Formation to the Company from the Secretary of State of the State of Texas, pursuant to TBOC.

2.2.    **Principal Place of Business.** The principal office and place of business of the Company are set forth on Exhibit A. The Company may locate its place of business and principal office at any other place or places as the Managers may from time to time deem necessary or advisable.

2.3.    **Registered Office and Agent.** The registered office and registered agent of the Company shall be the registered office and registered agent named in the Certificate and set forth on Exhibit A. The Company may change the registered office and registered agent as the Managers may from time to time deem necessary or advisable.

2.4.    **Duration.** The period of duration of the Company is perpetual from the date its Certificate was filed with the Secretary of State of the State of Texas, unless the Company is earlier terminated in accordance with either the provisions of this Agreement or TBOC.

2.5.    **Purposes and Powers.** The purpose for which the Company is organized is to transact any or all lawful business for which limited liability companies may be organized under TBOC. The Company shall have any and all powers that are necessary or desirable to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under TBOC. The Company shall carry out the foregoing activities pursuant to the arrangements set forth in the Certificate and this Agreement.

2.6.    **Foreign Qualification.** The Managers shall cause the Company to comply, to the extent legally possible, with all requirements necessary to qualify the Company as a foreign limited liability company in each jurisdiction in which the Company conducts business. To the extent required by law or as the Managers determine is otherwise advisable, the Managers shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all jurisdictions in which the Company conducts business.

2.7.    **No State-Law Partnership.** The Managers and the Members intend that (i) the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, (ii) no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and (iii) this Agreement may not be construed to suggest otherwise. This Section 2.7 does not prohibit a Member or Manager, in his individual or independent capacity, from being associated with another Member or Manager in another Person.

- 8 -

**ARTICLE 3**

**MEMBERSHIP**

3.1.    **Members.**  The initial Members are set forth on <u>Exhibit A</u>.

3.2.    **Additional Members.**  Subject to <u>Sections 4.6(c)</u> and <u>6.7</u>, additional Persons may be admitted to the Company as Members on the terms and considerations as determined with the Approval of a Majority of the Members.  The provisions of this <u>Section 3.2</u> shall not apply to Transfers of Membership Interests.

3.3.    **Transfer Restriction.**

(a)     <u>In General</u>. Notwithstanding any other provision of this Agreement, no Member may Transfer in any manner whatsoever all or any part of his Units unless (i) such Transfer is either (A) Approved by a Majority of the Members or (B) in compliance with <u>Sections 3.5</u> or <u>3.6</u>; (ii) such Transfer is both (A) Approved by a Majority of the Members and (B) in compliance with <u>Section 3.4</u>, (iii) after giving effect thereto, such Transfer would not otherwise terminate the Company for the purposes of Code Section 708 or cause the Company to be classified as other than a partnership for U.S. federal income tax purposes, and (iv) such Transfer would not result in a violation of applicable law, including U.S. federal or state securities laws, or any term or condition of this Agreement.  Any purported Transfer by a Member or any Assignee that is not in compliance with this Agreement is hereby declared to be null and void and of no force or effect whatsoever.

(b)     <u>Power of Attorney</u>.  Each Member hereby irrevocably constitutes and appoints the Managers as his/its attorney-in-fact to execute any documents necessary to carry out the terms of <u>Article 3</u>. Each Member hereby acknowledges that such power of attorney is coupled with an interest, is irrevocable, and is transferable to any successor of the Managers.

(c)     <u>Record Owner</u>.  The Company and the Managers shall be entitled to treat the record owner (on the books of the Company) of any Membership Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash or other property made in good faith to such owner until such time as a written instrument of assignment of such Membership Interest has been received and accepted by the Managers and recorded on the books of the Company.

3.4.    **Right of First Refusal.**  Each time a Member (the "*Seller*") desires to make any Transfer of all or any portion of his Units, or upon the Bankruptcy of a Seller, such Seller must comply with the provisions of this <u>Section 3.4</u>.  The Seller shall inform the Managers by notice in writing (the "*Transfer Notice*") (the date upon which such Transfer Notice is received being the "*Transfer Notice Date*") stating the Units (or portion thereof) that are subject to such proposed Transfer (the "*Offered Units*"), the identity of the proposed transferee, and the other terms and conditions of such proposed Transfer, including any consideration proposed to be received pursuant to a bona fide written agreement for the Offered Units (and, if the proposed Transfer is to be wholly or partly for consideration other than money, the Transfer Notice shall state the proposed price as being equal to the amount of the monetary consideration, if any, plus the fair market value of the other consideration, which valuation shall be subject to the approval of the Company) (collectively, the "*Transfer Amount*").  If the Offered Units are proposed to be Transferred by gift or otherwise without consideration to the Seller, the Transfer Amount shall be an amount equal to the Fair Market Value of the Units. If the Transfer Amount is determined by appraisal, then for the remainder of this <u>Section 3.4</u> the "Transfer Notice Date" shall be the date of the final determination of the Transfer Amount by the appraiser.  The Managers shall promptly deliver a copy of the Transfer Notice to the Founders and the Non-Founders (other than the Seller).  By giving the Transfer Notice, the Seller

shall be deemed to have granted to the Company, the Founders, and the Non-Founders (other than the Seller) an option to purchase the Offered Units for the price and upon the terms set forth in this Section 3.4:

(a)     Company Election. Within thirty (30) days of the Transfer Notice Date, the Managers (on the Company's behalf) shall notify the Founders of the number of Offered Units that the Company elects to purchase.

(b)     Founder Election. If the Company notifies the Founders that it will exercise its option to purchase none or less than all of the Offered Units, each of the Founders shall have until the forty-fifth (45th) day following the Transfer Notice Date within which to notify the Company of such Founder's election to purchase such Founder's Pro Rata portion of the remaining Offered Units. If any of the Founders elects to purchase none or less than all of his Pro Rata portion of the remaining Offered Units (the remaining Offered Units that such Founder elects not to purchase being called "*Remaining Units*"), the Company shall, within fifty (50) days of the Transfer Notice Date, notify the other Founders of such election and each of the other Founder's, Pro Rata or as they may otherwise agree, may elect, by notifying the Company in writing within sixty (60) days of the Transfer Notice Date, to purchase such Remaining Units. Any Founder notifying the Company of his desire to purchase any of the Offered Units shall be obligated to do so.

(c)     Non-Founder Election. If the Company notifies the Non-Founders that the Founders will exercise their option to purchase none or less than all of the Remaining Units, each Non-Founder shall have until the seventy-fifth (75th) day following the Transfer Notice Date within which to notify the Company of its election to purchase such Non-Founder's Pro Rata portion of the Remaining Units. If any of the Non-Founders elects to purchase none or less than all of his Pro Rata portion of Remaining Units, the Company shall within eighty (80) days of the Transfer Notice Date, notify the other Non-Founders of such election and each of the other Non-Founders, Pro Rata or as they may otherwise agree, may elect, by notifying the Company in writing within ninety (90) days of the Transfer Notice Date, to purchase such Remaining Units. Any Non-Founder notifying the Company of his desire to purchase any of the Remaining Unties shall be obligated to do so.

(d)     Election Notification. Upon determination of the number of Offered Units to be purchased by the Company, the Founders and/or the Non-Founders, the Company, on its behalf and on behalf of the Founders and Non-Founders who are purchasing Offered Units, shall give notice of exercise to the Seller within ninety-five (95) days of the Transfer Notice Date.

(e)     Closing. The closing of the purchase of the Offered Units by the Company, the Founders, and/or the Non-Founders shall occur within one hundred (100) days after the Transfer Notice Date. At the closing, the Seller shall Transfer the Offered Units to the Company, the Founders, and/or the Non-Founders free and clear of all liens and encumbrances, and Seller shall execute and deliver any documentation that the Company, the Founders, and/or the Non-Founders deem reasonable to effect such Transfer. Payment of the purchase price shall be made in cash.

(f)     Disposition of Offered Units. If the Company, Founders, and/or the Non-Founders do not elect to purchase all of the Offered Units within the period provided, then all of such remaining Offered Units may be disposed of by the Seller to the prospective transferee named in the Transfer Notice, for the price and on the terms and conditions set forth in the Transfer Notice, at any time within one hundred ten (110) days after the Transfer Notice Date, provided each transferee shall, prior to a Transfer to such transferee, execute and deliver to the Company a valid and binding agreement to the effect that any Units so Transferred shall continue to be subject to all of the provisions of this

- 10 -

Agreement. Any Units not so disposed of within such one hundred and ten (110) day period shall also remain subject to all of the provisions of this Agreement.

(g) Assignees. No Assignee shall be admitted as a Substitute Member except as provided in the provisions of Section 3.7.

3.5. **Redemption Right**. In the event the Company terminates a Founder's employment with the Company for Cause (as defined in that Founder's Employment Agreement) prior to the fifth (5th) anniversary of the date of this Agreement (a "*Redemption Event*"), all Units of that Founder (the "*Redeemed Units*") shall immediately, without further action by the Company or the relevant Founder other than the Company's tender of the Redemption Price, be redeemed by the Company for $100.00 cash (the "*Redemption Price*"). Upon the date of the Redemption Event, the relevant Founder shall cease to have any rights with respect to the Redeemed Units.

3.6. **Community Property**.

(a) Purchase Right. Each individual Member agrees to notify the Company in writing promptly, and in any event not later than ten (10) days after the occurrence of a Community Property Event with respect to him/her (the "*CP Notice*") (the date upon which such CP Notice is received being the "*CP Notice Date*"). Upon the occurrence of a Community Property Event, the relevant Member (the "*CP Member*") shall have an option to purchase all of the Units owned by that CP Member's spouse, estate, or heirs (collectively, the "*CP Spouse*," and the Units owned by the CP Spouse, the "*CP Units*"). The CP Member shall have until the twentieth (20th) day following the CP Notice Date to notify the CP Spouse in writing of his/her election to purchase the CP Units for the CP Purchase Price.

(b) Company Election. In the event the CP Member fails to purchase all of the CP Units within thirty (30) days after the CP Notice Date, the Company shall have the right to purchase the remaining CP Units for the CP Purchase Price by delivering written notice of such purchase to the CP Spouse.

(c) Founder Election. In the event the Company fails to purchase all of the remaining CP Units within forty-five (45) days after the CP Notice Date, the Company shall promptly notify the Founders in writing, and each Founder (excluding the CP Member) shall have until the sixtieth (60th) day following the CP Notice Date within which to notify the Company of such Founder's election to purchase his Pro Rata portion of the CP Units. If any of the Founders elects to purchase none or less than all of his Pro Rata portion of the CP Units (the remaining CP Units that such other Founders elect not to purchase being called "*Remaining CP Units*"), the Company shall, within sixty-five (65) days of the date of the CP Notice Date notify the purchasing Founders of such election and each of the purchasing Founders, Pro Rata or as they may otherwise agree, may elect, by notifying the Company in writing within seventy-five (75) days of the CP Notice Date, to purchase such Remaining CP Units.

(d) Non-Founder Election. In the event the Founders fail to purchase all of the Remaining CP Units within ninety (90) days after the CP Notice Date, the Company shall promptly notify the Non-Founders in writing, and each Non-Founder (excluding the CP Member) shall have until the one hundredth (100th) day following the CP Notice Date within which to notify the Company of that Non-Founder's election to purchase his Pro Rata portion of the Remaining CP Units. If any of the Non-Founders elects to purchase none or less than all of his Pro Rata portion of the Remaining CP Units, the Company shall, within one hundred and five (105) days of the date of the CP Notice Date notify the purchasing Non-Founders of such election and each of the purchasing Non-Founders, Pro Rata or as they may otherwise agree, may elect, by notifying the Company in writing within one hundred and fifteen (115) days of the CP Notice Date, to purchase such Remaining CP Units.

(e)    Purchase Price.  The purchase price for each CP Unit shall be equal to Fair Market Value (the "*CP Purchase Price*").  The CP Purchase Price shall be paid, at the election of the purchaser, (i) in cash or (ii) with a note (A) payable in equal annual installments for a period of five (5) years, (B) accruing interest at the Prime Rate, (C) with equal amortization of principal and interest and (D) with the first payment being due thirty (30) days after the CP Closing.

(f)    Closing.  The closing of the purchase of the CP Units (the "*CP Closing*") shall occur no later than one hundred and thirty (130) days following the CP Notice Date.  At the CP Closing, the CP Spouse will Transfer the portion of the CP Units sold to the CP Member, the Company, the Founder, and/or the Non-Founder, free and clear of any and all encumbrances of any kind whatsoever other than those created by this Agreement, in exchange for the CP Purchase Price.

(g)    Spousal Acknowledgements.  Any spouse of a Member who obtains Units pursuant to a Community Property Event shall be treated as a transferee, shall not be admitted to the Company as a Substitute Member, and shall not have the management rights and/or approval rights, as appropriate, of a Member under this Agreement, including the right to vote on Company actions. Generally, the provisions of Section 3.8 shall control the rights of a party who succeeds to all or part of the economic interest in the Company of a Member.  Furthermore, by signing the spouse's agreement set forth on Exhibit C, each spouse of a Member agrees to be bound by the terms of this Agreement.

3.7.    **Substitute Member**.  No Assignee shall have the right to become a substitute Member (a "*Substitute Member*") upon Transfer of any Units to it unless all the following conditions are satisfied:

(a)    The Member and the Assignee shall have executed and acknowledged such other instruments and taken such other action as the Managers shall deem reasonably necessary or desirable to effect such substitution, including, without limitation, the execution by the Assignee of a subscription agreement and an appropriate amendment to this Agreement;

(b)    The conditions set forth in Section 3.3 shall have been satisfied, and, if requested by the Managers, the Member or the Assignee shall have obtained an opinion of counsel satisfactory to the Managers;

(c)    The Member or the Assignee shall have paid to the Company such amount of money as is sufficient to cover all expenses incurred by or on behalf of the Company in connection with such substitution; and

(d)    The Assignee has been Approved by a Majority of the Members as a Substitute Member.

3.8.    **Assignee's Rights**.

(a)    Unless an Assignee becomes a Substitute Member in accordance with the provisions of Section 3.7, it shall not be entitled to any of the rights (including voting rights) granted to a Member hereunder or under TBOC, other than the right to receive the share of distributions and any other items attributable to a Member's Units to which its assignor would otherwise be entitled.

(b)    Any Member that Transfers all of its Units shall cease to be a Member.

3.9.    **Tax Matters**.  On the Transfer of all or part of any Units, at the request of the Assignee of the Units, the Managers may cause the Company to elect, pursuant to Code Section 754 to adjust the tax basis of the properties of the Company as provided by Code Sections 734 and 743.

3.10.   **Information**.

(a)    In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to TBOC, under the circumstances therein stated.

(b)    The Members acknowledge that, from time to time, they may receive information from or concerning the Company in the nature of trade secrets or that otherwise is confidential, the release of which may damage the Company or Persons with which it does business. Each Member shall hold in strict confidence any information that it receives concerning the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the other Members promptly of any request for that information, before disclosing it, if legal and practicable), (ii) to advisers or representatives of the Member or Persons to whom that Member's Membership Interest may be Transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this Section 3.10(b), or (iii) of information that the Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality. The Members acknowledge that breach of the provisions of this Section 3.10(b) may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Section 3.10(b) may be enforced by specific performance.

3.11.   **Lack of Authority**. No Member (unless that Member is also a Manager or an officer and is acting in that capacity pursuant hereto) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to incur any expenditures on behalf of the Company.

3.12.   **Liability to Third Parties**. No Member or Manager is liable for the debts, obligations, or liabilities of the Company, including under a judgment, decree or order of a court.

3.13.   **Withdrawal**. No Member has the right to withdraw from the Company as a Member without the unanimous consent of all Members to permit that withdrawal.

3.14.   **Certificates**. Certificates in the form determined by the Managers may be delivered representing all Membership Interests to which Members are entitled. If issued, such certificates shall be consecutively numbered, and shall be entered in the books of the Company as they are issued. Each certificate shall state on the face thereof the holder's name, the Membership Interest represented thereby and such other matters as may be required by applicable laws. Each such certificate shall be signed by at least one (1) Manager and may be sealed with the seal of the Company or a facsimile thereof if adopted. The signature of the Managers upon the certificates may be a facsimile. Subject to Section 3.3, upon surrender to the Company or the transfer agent of the Company of a certificate for Membership Interests duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the Company to issue a new certificate to the Person entitled thereto, cancel the old certificate and record the transaction upon its books and records.

## ARTICLE 4

### MEETINGS OF MEMBERS

4.1. **Place.** All meetings of the Members shall be held at the principal office of the Company or at such other place within or without the State of Texas as may be determined by the Managers and set forth in the respective notice or waivers of notice of such meeting.

4.2. **Annual Meetings.** The annual meeting of the Members for the election of Managers and the transaction of such other business as may properly come before the meeting shall be held at such time and date as shall be designated by the Managers from time to time and stated in the notice of the meeting. Such annual meeting shall be called in the same manner as provided in this Agreement for special meetings of the Members, except that the purposes of such meeting must be enumerated in the notice of such meeting only to the extent required by law in the case of annual meetings.

4.3. **Special Meetings.** Special meetings of the Members may be called by the Managers or by the holders of not less than twenty-five percent (25%) of all the Units. Business transacted at all special meetings shall be confined to the purposes stated in the notice.

4.4. **Notice.** Written or printed notice stating the place, day and hour of the meeting and, in the case of special meetings, the purpose or purposes for which the meeting is called, shall be delivered not less than seven (7) nor more than sixty (60) days before the date of the meeting, by or at the direction of the Managers or Person calling the meeting, to each Member of record entitled to vote at such meeting.

4.5. **Quorum.** The Members holding a majority of the Units shall constitute a quorum at all meetings of the Members, except as otherwise provided by law. Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting. If, however, such quorum shall not be present at any meeting of the Members, the Members entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until the holders of the requisite amount of Units shall be present or represented. At any meeting of the Members at which a quorum is present, an action Approved by a Majority of the Members or Approved by a Super Majority of the Members, as applicable, shall be the act of the Members, unless the vote of a greater number is required by law or this Agreement.

4.6. **General Voting Procedures.** Each outstanding Unit shall be entitled to one (1) vote on each matter submitted to a vote or for approval unless otherwise provided by law.

(a) In addition to any restrictions set forth in Section 4.6(c), the following actions require the Approval of a Majority of the Members unless otherwise indicated:

(i) To admit a new Member (other than the initial Members);

(ii) To decrease or increase the number of Managers;

(iii) To borrow funds (other than in the ordinary course of business) in the name of the Company (other than Member Loans);

(iv) To cause the Company to sell, transfer or otherwise dispose of all or substantially all of its Property;

- 14 -

(v)     To merge or otherwise combine with another Person;

(vi)    To take any action that would make it impossible to carry on the ordinary business of the Company, including filing for bankruptcy protection;

(vii)   To amend this Agreement; or

(viii)  To take any other action requiring Approval of a Majority of the Members.

(b)     The following actions required the Approval of a Super Majority of the Members unless otherwise indicated:

(i)     To wind-up the Company; or

(ii)    To take any other action requiring Approval of a Super Majority of the Members.

(c)     The Members and Managers acknowledge and agree that the holders of the Convertible Notes have those certain approval rights as set forth in the Convertible Notes.

4.7.    **List of Members Entitled to Vote.**  The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting, or any adjournment of such meeting, arranged in alphabetical order, with the address of and the Units held by each, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member at any time during usual business hours.  Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to inspection of any Member during the whole time of the meeting.  However, failure to comply with the requirements of this Section 4.7 shall not affect the validity of any action taken at such meeting.

4.8.    **Registered Members.**  The Company shall be entitled to treat the holder of record of any Units as the holder in fact of such Units for all purposes, and accordingly shall not be bound to recognize any equitable or other claim to or interest in such Units on the part of any other Person, whether or not it shall have express or other notice of such claim or interest, except as expressly provided by this Agreement or the laws of the State of Texas.

4.9.    **Actions Without a Meeting and Telephonic Meetings.**  Notwithstanding any other provision contained in this Article 4, all actions of the Members provided for herein may be taken by written consent without a meeting, or any meeting thereof may be held by means of a telephone conference. Any action that may be taken by the Members without a meeting shall be effective only if the written consent or consents are in writing, set forth the action so taken, and are signed by the holder or holders of Membership Interests constituting not less than the minimum amount of Units that would be necessary to take the action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted.

## ARTICLE 5

### RIGHTS AND DUTIES OF MANAGERS

5.1.    **Management.**  The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under, its designated Manager or Managers.  In addition to the powers and authorities expressly conferred by this Agreement upon the Managers, the Managers may exercise all such powers of the Company and do all such lawful acts and things as are not directed or required to be exercised or done by the Members by TBOC or this Agreement, including, but not limited to, contracting for or incurring debts, liabilities and other obligations on behalf of the Company.

5.2.    **Number and Qualifications.**  The number of Managers shall not be less than one (1) nor more than three (3), as may be determined by the Members from time to time, but no decrease in the number of Managers shall have the effect of shortening the term of any incumbent Manager.  Managers need not be residents of the State of Texas.  The Managers in their discretion may elect a chairman of the Managers who shall preside at meetings of the Managers.

5.3.    **Election.**  At the first annual meeting of the Members and at each annual meeting thereafter, the Members, by the Approval of a Majority of the Members, shall elect one (1) or more Managers to hold office until the next succeeding annual meeting.  Unless removed in accordance with this Agreement, each Manager shall hold office for the term for which such person is elected and until such person's successor shall be elected and qualified.

5.4.    **Vacancy.**  Any vacancy occurring for any reason in the number of Managers shall be filled by the Approval of a Majority of the Members.  A Manager elected to fill a vacancy shall be elected for the unexpired term of the predecessor in office.

5.5.    **Removal.**  At a meeting called expressly for such purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by the Approval of a Majority of the Members.

5.6.    **Place of Meetings.**  All meetings of the Managers may be held either within or without the State of Texas.

5.7.    **Annual Meetings.**  The annual meeting of Managers shall be held, without further notice, immediately following the annual meeting of Members, and at the same place, or at such other time and place as shall be fixed with the consent in writing of all the Managers.

5.8.    **Regular Meetings.**  Regular meetings of the Managers may be held without notice at such time and place either within or without the State of Texas as shall from time to time be determined by the Managers.

5.9.    **Special Meetings.**  Special meetings of the Managers may be called by any Manager on three (3) Business Days' notice to each Manager.

5.10.    **Quorum.**  At all meetings of the Managers, the presence of a majority of the Managers in number shall be necessary and sufficient to constitute a quorum for the transaction of business unless a greater number is required by law.  At a meeting at which a quorum is present, the act of a Majority shall be the act of the Managers, except as otherwise provided by law or this Agreement.  If a quorum shall not be present at any meeting of the Managers, the Managers present at the meeting may adjourn the meeting

from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

5.11. **Attendance and Waiver of Notice.** Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Managers need be specified in the notice or waiver of notice of such meeting.

5.12. **Compensation.** Managers, as such, shall not receive any stated salary for their services, but shall receive such compensation for their services as may be from time to time Approved by a Majority of the Members. In addition, a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of the Managers, provided that nothing contained in this Agreement shall be construed to preclude any Manager from serving the Company in any other capacity and receiving compensation for such service.

5.13. **Officers.** The Managers may, from time to time, designate one or more Persons to be officers of the Company. No officer need be a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer, and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers. Any officer may be removed as such, either with or without cause, by the Managers whenever in the Managers' judgment the best interests of the Company will be served thereby. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers.

5.14. **Indemnification.**

(a)    Right to Indemnification. Each individual who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "*Proceeding*"), by reason of the fact that he/she is or was a Manager or officer of the Company (hereinafter an "*Indemnitee*"), whether the basis of such Proceeding is an alleged action in an official capacity as Manager or officer, shall be indemnified and held harmless by the Company against all losses and expenses reasonably incurred by such Indemnitee in connection therewith, to the fullest extent permitted by the TBOC or other applicable law, but excluding those caused by the gross negligence or willful misconduct of the Indemnitee, subject to all limitations and requirements imposed by the TBOC. THE FOREGOING INDEMNIFICATION SPECIFICALLY INCLUDES THOSE CLAIMS THAT ARISE OUT OF THE INDEMNITEE'S SOLE, JOINT OR CONTRIBUTORY NEGLIGENCE, BUT SPECIFICALLY EXCLUDES THOSE CLAIMS THAT ARISE OUT OF THE INDEMNITEE'S WILLFUL MISCONDUCT, FRAUD OR GROSS NEGLIGENCE. THE INDEMNITEE WOULD NOT HAVE ENTERED THIS AGREEMENT IF NOT FOR THIS INDEMNIFICATION.

(b)    Right to Advancement of Expenses. The right to indemnification conferred in Section 5.14(a) shall include the right to be paid by the Company the expenses (including reasonable attorneys' fees and disbursements) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "*Advancement of Expenses*"); provided, however, an Advancement of Expenses incurred by an Indemnitee shall be made only upon delivery to the Company of an undertaking,

- 17 -

by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such Indemnitee is not entitled to be indemnified for such expenses under this <u>Section 5.14(b)</u> or otherwise.

(c)    <u>Non-Exclusivity Rights</u>. The right to indemnification and the advancement of expenses conferred in this <u>Section 5.14</u> shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, provision of this Agreement or any other agreement or otherwise.

(d)    <u>Insurance</u>. The Company may, but shall not be obligated to, obtain and maintain insurance, at its expense, to protect itself and any Manager or officer of the Company against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under the TBOC.

(e)    <u>Indemnification of Employees and Agents</u>. The Company may, to the extent authorized from time to time by the Managers, grant rights to indemnification, and rights to the Advancement of Expenses, to any employee or agent of the Company to the fullest extent of the provisions of this <u>Section 5.14</u> with respect to the indemnification and Advancement of Expenses of Managers and officers.

5.15.    **Actions Without a Meeting and Telephone Meetings**.  Notwithstanding any provision contained in this <u>Article 5</u>, all actions of the Managers provided for herein may be taken by written consent without a meeting, or any meeting thereof may be held by means of a conference telephone. Any such action that may be taken by the Managers without a meeting shall be effective only if the written consent or consents are in writing, set forth the action so taken, and are signed by the number of Managers constituting not less than the minimum amount of Managers that would be necessary to take such action at a meeting at which the Managers entitled to vote on the action were present and voted.

## ARTICLE 6

## CAPITALIZATION

6.1.    **Capital Contributions**.

(a)    Each Member has contributed cash or property to the Company in the amount set forth as the Capital Contribution of such Member on <u>Exhibit A</u>.

(b)    Subject to <u>Sections 4.6(c)</u> and <u>6.7</u>, if at any time the Managers determine that the Company has insufficient funds to carry out the purposes of the Company, the Managers may request that the Members make additional Capital Contributions; *provided, however,* that no Member shall be required to make an additional Capital Contribution.

(c)    No Member shall be paid interest on any Capital Contribution.

6.2.    **Member Loans**. Subject to <u>Section 4.6(c)</u>, if the Managers make a request for loans, the Members, Pro Rata or as they may otherwise agree, may make a loan or loans to the Company.  The amount of any such loan or advance (the "***Member Loans***") shall not be deemed an increase in the Capital Contributions of the Member that makes such loan or entitle that lending Member to any increase in its Membership Interest.  Unless otherwise Approved by a Majority of the Members, any Member Loan (i) shall bear interest at the lower of (A) the Prime Rate plus two percent (2.0%) per annum or (B) the

Maximum Lawful Rate, which interest is payable on the first day of each month, (ii) shall have a term of three (3) years, and (iii) shall be recourse to the Company but not to any Member.

6.3.     **Capital Accounts**. The Company shall establish and maintain a separate capital account ("*Capital Account*") for each Member in accordance with the rules of Treasury Regulation Section 1.704-1(b)(2)(iv) and in accordance with the following provisions; provided, however, the Managers shall "book-up" or "book-down" the Capital Accounts of the Members in accordance with Section 6.3(c).

(a)     The Capital Account balance of each Member shall be credited (increased) by (i) the amount of cash contributed by such Member to the capital of the Company, (ii) the fair market value of property contributed by such Member to the capital of the Company (net of liabilities secured by such contributed property that the Company assumes or takes subject to under Code Section 752), and (iii) such Member's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 7.4 and 7.5; and

(b)     The Capital Account balance of each Member shall be debited (decreased) by (i) the amount of cash distributed to such Member by the Company, (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member assumes or takes subject to under Code Section 752), (iii) such Member's allocable share of expenditures of the Company described in Code Section 705(a)(2)(B), and (iv) such Member's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 7.4 and 7.5.

The provisions of this Section 6.3 and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions. The Managers may modify the manner in which the Capital Accounts are maintained under this Section 6.3 in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(c)     Revaluations.     The Managers shall "book-up" or "book-down" the Capital Accounts of the Members to their fair market values, regardless of the rules set forth in Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f), upon the conversion of the Convertible Notes.

6.4.     **Withdrawal or Reduction of Capital Contributions**.

(a)     No Member shall have the right to withdraw all or any part of his Capital Contribution or to receive any return on any portion of his Capital Contribution, except as may be otherwise specifically provided in this Agreement. Under circumstances involving a return of any Capital Contribution, no Member shall have the right to receive property other than cash.

(b)     No Member shall have priority over any other Member, either as to the return of Capital Contributions or distributions; *provided, however*, that this subsection shall not apply to loans (as distinguished from Capital Contributions) that a Member has made to the Company.

6.5.     **Units**. The Units of each Member are set forth opposite such Member's respective name on Exhibit A. The Members acknowledge and agree that upon the conversion of the Convertible Notes pursuant to the terms of the Convertible Notes, the holders of such Convertible Notes shall receive, in the aggregate, a number of Units that equal forty percent (40%) of the issued and outstanding Units of the Company.

6.6.    **Liability of Members.**  No Member shall be liable for the debts, liabilities or obligations of the Company beyond such Person's respective Capital Contribution.  Except as otherwise provided herein, no Member shall be required to contribute to the capital of, or to loan any funds to, the Company.

6.7.    **Preemptive Rights.**

(a)    <u>Pre-Conversion of Convertible Notes</u>. Notwithstanding anything to the contrary in this Agreement, if at any time prior to the conversion of the Convertible Notes the Managers determine that it is in the best interest of the Company to raise additional capital, the Managers must first make a request for additional loans from the holders of the Convertible Notes pursuant to the terms of the Convertible Notes.

(b)    <u>Post-Conversion of Convertible Notes</u>.  Following the conversion of the Convertible Notes, the Company hereby grants to the Members the right to purchase the percentage of New Units equaling their Pro Rata share thereof, which the Company may, from time to time propose to sell and issue (such right, the *"Preemptive Right"*).  In the event that the Company proposes to undertake an issuance of New Units, it shall give each Member written notice of its intention, describing the number of New Units, the price, and the general terms upon which the Company proposes to issue the same (the *"Preemptive Right Notice"*).  Each Member shall have fifteen (15) days from the Preemptive Right Notice to agree to purchase all or a portion of their Pro Rata share of the New Units at the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Units to be purchased.  If any Member fails to purchase their Pro Rata part of the New Units, the other Members, Pro Rata or as they may otherwise agree, shall have the right to purchase the remaining New Units within thirty (30) days of the Preemptive Right Notice.  In the event that the Members fail to exercise in part or in full the Preemptive Right within the thirty (30) day period specified above, the Company shall have fifty (50) days from the Preemptive Right Notice to sell (or enter into an agreement pursuant to which the sale of New Units covered thereby shall be closed, if at all, within thirty (30) days from the date of said agreement) the New Units with respect to which the rights of the Members were not exercised at a price and upon terms no more favorable to the purchasers thereof than specified in the Preemptive Right Notice.  In the event the Company has not sold the New Units within such fifty (50)-day period (or sold and issued New Units in accordance with the foregoing within thirty (30) days from the date of such agreement) the Company shall not thereafter issue or sell any New Units without first offering such New Units to the Members in the manner provided above.

## ARTICLE 7

### ALLOCATIONS AND DISTRIBUTIONS

7.1.    **Distributions of Distributable Cash.**  All distributions of Distributable Cash or other property shall be made at such time as determined by a Majority in the following order of priority: (a) first, to holders of outstanding Convertible Notes pursuant to the terms of the Convertible Notes; and (b) second,  to the Members as of the record date of the distribution Pro Rata.  All amounts withheld pursuant to the Code or any provisions of state or local tax laws with respect to a Member shall be treated as amounts distributed to that Member pursuant to this <u>Section 7.1</u>.

7.2.    **Basic Allocations.**

(a)    <u>In General</u>.  After taking into account the special allocations set forth in this <u>Article 7</u>, Profits and Losses for each calendar year (or portion thereof), shall be allocated among the Members in the manner that will cause their Partially Adjusted Capital Accounts to equal, as soon as possible, their Targeted Accounts.

(b)     Limitation on Loss Allocations. If any allocation of Losses would cause a Member to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the other Members Pro Rata.

7.3.   **Allocations on Transfers.** Income, gain, loss, deduction, or credit attributable to a Membership Interest that has been Transferred (including the simultaneous decrease in the Membership Interest of existing Members resulting from the admission of a new Member) shall be allocated between the transferor and the transferee as follows:  (i) for the months before the Transfer, to the transferor; (ii) for the months after the Transfer, to the transferee; and (iii) for the month of the Transfer, to the transferee if the Transfer occurs on or before the fifteenth (15th) day of the month and to the transferor if the Transfer occurs thereafter.  For purposes of the above allocation, except for extraordinary items, which shall be allocated in a manner determined by the Managers, all such items shall be allocated equally among the months of the Fiscal Year without regard to the Company's operations during those months. Distributions of Company assets with respect to a Membership Interest shall be made only to the Persons who, according to the records of the Company, are the owners, on the actual date of distribution, of the Membership Interests with respect to which the distributions are made.  No liability shall result from making distributions in accordance with the provisions of the preceding sentence, whether or not any Member, any Manager or the Company has knowledge or notice of a Transfer or purported transfer of a Membership Interest.

7.4.   **Special Allocations.** If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     Qualified Income Offset. If a Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5), or (d)(6), then items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, *provided* that an allocation pursuant to this Section 7.4(a) shall be made if and only to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 7 have been tentatively made without considering this Section 7.4(a).

(b)     Gross Income Allocation. If a Member has a deficit Capital Account at the end of any Fiscal Year of the Company that exceeds the sum of (i) the amount the Member is obligated to restore, and (ii) the amount the Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Member shall be specially allocated items of income and gain of the Company in the amount of the excess as quickly as possible, *provided* that an allocation pursuant to this Section 7.4(b) shall be made if and only to the extent that the Member would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 7 have been tentatively made without considering Section 7.4(a) or 7.4(b).

(c)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any asset of the Company under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that section of the Treasury Regulations.

(d)    Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 7, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Member shall be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Partnership Minimum Gain during such year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 7.4(d) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(e)    Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 7 (other than Section 7.4(d)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Member with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods in an amount equal to such Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during such year determined in accordance with Treasury Regulations Section 1.704-2(g)(2)).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 7.4(e) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(f)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall be allocated among the Members Pro Rata.

(g)    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

7.5.    **Curative Allocations.**  The "Basic Regulatory Allocations" consist of (i) the allocations pursuant to Section 7.2(b), and (ii) the allocations pursuant to Sections 7.4(a) through 7.4(g).  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 7.5 shall be made only with respect to allocations pursuant to Section 7.4(c) to the extent that it can reasonably be determined that those allocations will otherwise be inconsistent with the economic agreement among the parties to this Agreement.

7.6.    **Built-in Allocations.**  In accordance with Code Sections 704(b) and 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to property actually or constructively contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation at the time of the contribution between the tax basis of the property to the Company and its initial book value.  If the book value of a Company asset is adjusted, then as provided in the Treasury Regulations promulgated under Code Section 704(b), subsequent allocations of income, gain, loss, and deduction with respect to that Company asset shall take

- 22 -

account of any variation between the tax basis of the asset and its book value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.  Any elections or other decisions relating to those allocations shall be made by the tax matters partner (as designated pursuant to Section 8.4) in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss, and deduction pursuant to this Section 7.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other tax items or distributions pursuant to any provision of this Agreement.

7.7.    **Regulatory Compliance.**  The Members hereby adopt those provisions of the Treasury Regulations issued under Code Section 704(b) that are required to be included in a partnership agreement as a condition to having the allocations of tax items set forth in the agreements respected for income tax purposes.  The Members shall exercise the utmost good faith in cooperating to amend this Agreement to effect changes recommended by the Company's professional tax advisers to cause compliance with those Treasury Regulations, with nonbinding consultation from the tax advisers of any Member that desires to have any given in his behalf.

7.8.    **Limitations Upon Distributions.**  No distribution shall be declared and paid unless after the distribution is made, the assets of the Company are in excess of all liabilities of the Company (as determined in accordance with accounting principles applied on a consistent basis under the Company's method of accounting), except liabilities to Members on account of their Capital Contributions.

## ARTICLE 8

## BOOKS AND ACCOUNTS

8.1.    **Accounting Principles.**  Profits and Losses shall be determined in accordance with generally accepted accounting principles applied on a consistent basis under the Company's method of accounting.

8.2.    **Records and Reports.**  At the expense of the Company, the Managers shall maintain records and accounts of all operations and expenditures of the Company and submit annual reports regarding same to each Member.  At the request of any Member, the Company shall conduct an audit at the expense of that Member.  At a minimum, the Company shall keep at its principal place of business the following records:

(a)    A current list that states:  (i) the name and mailing address of each Member and (ii) the Units owned by each Member;

(b)    Copies of the federal, state, and local information or income tax returns for each of the Company's six (6) most recent tax years (or such shorter period that the Company has been in existence);

(c)    A copy of the Certificate and this Agreement, all amendments or restatements thereof, and executed copies of any powers of attorney;

(d)    Correct and complete books and records of account of the Company; and

(e)    Any other books, records or documents required by this Agreement, the Certificate, TBOC, or other applicable law.

8.3.    **Tax Returns and Other Elections.**  The Managers intend for the Company to be treated, for federal, state, and municipal income tax purposes, as a partnership.  The Managers shall prepare, or cause the Accountant to prepare, all federal, state, and local income and other tax returns that the Company is required to file and shall furnish a copy of each Member's IRS Form K-1 and any other information that any Member reasonably requests relating thereto, as soon as practicable after the end of the Fiscal Year.  All elections permitted to be made by the Company under federal or state laws shall be made by the Managers.

8.4.    **Tax Matters Partner.**  The Person identified as the "*Tax Matters Partner*" on <u>Exhibit A</u> is hereby designated to be the "*tax matters partner*" of the Company pursuant to Code Section 6231(a)(7) and shall serve in such capacity until a new "*tax matters partner*" is designated with the Approval of a Majority of the Members.  Any Member who is designated "*tax matters partner*" shall take such action as may be necessary to cause each other Member to become a "*notice partner*" within the meaning of Code Section 6223.  Any Member who is designated "*tax matters partner*" shall inform each other Member of all significant matters that may come to its attention in its capacity as "*tax matters partner*" by giving notice thereof on or before seven (7) days after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.  Any Member who is designated "*tax matters partner*" may not take any action contemplated by Code Sections 6222 through 6231 without the consent of the Managers, but this sentence does not authorize any Person to take any action left to the determination of an individual Member under Code Sections 6222 through 6231.

8.5.    **Bank Accounts.**  All funds of the Company shall be deposited in its name in an account maintained in an insured, commercial financial institution, as determined by the Managers.  The funds of the Company shall not be commingled with the funds of any other Person.  Checks may be drawn on the Company's account or accounts only for the purposes of the Company and shall be signed by one or more of the Managers.

## ARTICLE 9

## WINDING-UP AND TERMINATION

9.1.    **Events Requiring Winding-up.**

(a)    The Company shall be wound up upon the first to occur of the following:

(i)    On the election to dissolve the Company Approved by a Super Majority of the Members;

(ii)    On the death, retirement, resignation, expulsion, legal incapacity, dissolution, or Bankruptcy of the last remaining Member;

(iii)    The entry of a judicial decree requiring winding-up under TBOC; or

(iv)    TBOC so requires and the requirement is not validly varied by the Certificate or this Agreement.

(b)    Nothing contained in this <u>Section 9.1</u> is intended to permit a Member to cause the Company to wind-up at will (by retirement, resignation, withdrawal, or otherwise), or to exonerate a Member from liability to the Company and the remaining Members if it causes the Company to wind-up

at will.  An unpermitted winding-up at will of the Company is in contravention of this Agreement for purposes of TBOC.

9.2.    **Process of Winding-up**.

(a)    On winding-up of the Company, the business and affairs of the Company shall terminate, the assets of the Company shall be liquidated, and the Company's affairs shall be wound up under this Article 9.

(b)    The winding-up of the Company shall begin as of the day on which the event giving rise to the winding-up occurs, but the Company shall not terminate until (i) there has been a completion of the winding-up of the Company's business and affairs and (ii) the Company's assets have been distributed as provided in Section 9.3.

(c)    On winding-up of the Company, the Members who have not caused the winding-up may cause any part or all of the assets of the Company to be sold in the manner Approved by a Majority of the Members (excluding Members who caused the winding-up), in an effort to obtain the best prices for the assets; *provided, however,* the Managers may distribute assets of the Company in kind to the Members to the extent practicable.

9.3.    **Distribution of Assets on Winding-up**.  In settling accounts during winding-up, the assets of the Company shall be paid, reserved, or distributed in the following order:

(a)    First, amounts owed to creditors, including the holders of the Convertible Notes, shall be paid to those creditors, in the order of priority as provided by law, except those to Members on account of their Capital Contributions;

(b)    Second, amounts necessary to establish, for a period not to exceed one (1) year after the date of dissolution, cash reserves that the Managers deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company shall be held as reserves by the Company; and

(c)    Third, any remainder shall be distributed to the Members Pro Rata.

Distributions pursuant to this Section 9.3 may be made to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying contingent or unforeseen liabilities or obligations of the Company.  The assets of any such trust shall be distributed to the Members from time to time, subject to the Approval of a Majority of the Members, in the same proportions as the amounts distributed to the trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement.

9.4.    **Distributions in Kind**.  Assets of the Company shall be distributed to the Members entitled thereto as tenants-in-common in the same proportions as the Members would have been entitled to cash distributions if the property had been sold for cash and the net proceeds distributed to the Members.  If distributions in kind are made to the Members on dissolution and winding up of the Company, the Capital Account balances of those Members shall be adjusted to reflect the Members' allocable share of gain or loss that would have resulted if the distributed property had been sold at its fair market value.

9.5.    **Certificate of Termination**.  When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made therefor, and all of the remaining property

and assets of the Company have been distributed to the Members according to their respective rights and interests, a Certificate of Termination shall be executed on behalf of the Company by one or more of the Managers or an authorized Member and shall be filed with the Office of the Secretary of State of the State of Texas, and the Managers and Members shall execute, acknowledge, and file any and all other instruments necessary or appropriate to reflect the completion of the winding-up and termination of the Company.

## ARTICLE 10

## MISCELLANEOUS PROVISIONS

10.1.    **Notices.**

(a)    Any notice, notification, demand, or request provided or permitted to be given under this Agreement must be in writing and shall have been deemed to have been properly given, unless explicitly stated otherwise, if sent by (i) FedEx or other comparable overnight courier, (ii) registered or certified mail, postage prepaid, return receipt requested, (iii) electronic transmission, or (iv) facsimile transmission during normal business hours to the place of business of the recipient.

(b)    For purposes of all notices, the addresses and facsimile numbers of the Managers and the Members are set forth on Exhibit A.

(c)    All notices, notifications, demands, or requests so given shall be deemed given and received (i) if sent via FedEx or other comparable overnight courier, the next Business Day after being deposited with such carrier, (ii) if mailed, five (5) Business Days after being deposited in the mail, (iii) if by electronic transmission, the next Business Day after being electronically transmitted, or (iv) if sent via facsimile transmission, the next Business Day after being so transmitted.

10.2.    **Amendments.**

(a)    Except as otherwise expressly set forth in this Agreement, this Agreement may be amended, supplemented, or restated only upon the Approval of a Majority of the Members. Notwithstanding the foregoing, this Agreement may be amended by the Managers without the consent of the Members to: (i) amend Exhibit A pursuant to this Agreement, and (ii) cure any ambiguity or correct or supplement any provision hereof that is incomplete or inconsistent with any other provision hereof or correct any printing, stenographic, or clerical error or omissions; *provided, however,* such amendment does not disproportionately adversely affect the distribution rights of any of the Members.

(b)    The Certificate may be amended, supplemented, or restated only upon the Approval of a Majority of the Members. Upon obtaining the approval of any amendment to the Certificate, the Managers shall cause a Certificate of Amendment in accordance with TBOC to be prepared, and such Certificate of Amendment shall be executed by at least one (1) Manager and shall be filed in accordance with TBOC.

10.3.    **Application of Texas Law.** This Agreement and the application or interpretation hereof, shall be governed exclusively by the laws of the State of Texas, and specifically TBOC.

10.4.    **No Action for Partition.** No Member shall have any right to maintain any action for partition with respect to the Property.

10.5.    **Headings and Sections.**  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.   Unless the context requires otherwise, all references in this Agreement to Sections or Articles shall be deemed to mean and refer to Sections or Articles of this Agreement.

10.6.    **Number and Gender.**  Where the context so indicates, the masculine shall include the feminine, the neuter shall include the masculine and feminine, and the singular shall include the plural.

10.7.    **Binding Effect.**  Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of the Members, their distributees, heirs, legal representatives, executors, administrators, successors, and assigns.

10.8.    **No Third-Party Beneficiary.**  This Agreement is made solely and specifically between and for the benefit of the parties hereto and their respective successors and assigns, subject to the expressed provisions hereof relating to successors and assigns.  No other Person has any rights, interest, or claims hereunder or is or will be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise unless specifically provided in this Agreement.

10.9.    **Sole and Absolute Discretion.**  Except as otherwise provided in this Agreement, all actions that any Manager and/or Member may take and all determinations that any Manager and/or Member may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of that Manager and/or Member.

10.10.    **Title to Company Property.**  To the extent that Property is held in the name of a Member, the Property shall be deemed held by that Member as agent and nominee for and on behalf of the Company.  Any other property acquired by or standing in the name of any Member shall be conclusively presumed not to be Property, unless an instrument in writing, signed by such Member, shall specify to the contrary.

10.11.    **Severability.**  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, the legality, validity, and enforceability of the remaining provisions of this Agreement shall not be affected thereby, and in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be legal, valid, and enforceable.

10.12.    **Counterparts.**  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and shall be binding upon the Members and Managers who executed the same, but all of such counterparts shall constitute the same Agreement.

10.13.    **Entire Agreement.**  The Certificate and this Agreement (i) constitute the entire agreement between the parties relating to the subject matter hereof and (ii) supersede all previous contracts and agreements between the parties hereto, both oral and written.

10.14.    **Acknowledgment.**  Each Member hereby agrees and acknowledges that (i) Haynes and Boone, LLP ("*Legal Counsel*") has been retained by the Managers to form and represent the Company, and in such capacity has provided legal services to the Company; (ii) Legal Counsel has not represented, nor will it represent, Members in connection with the formation of the Company, the acquisition of their Membership Interests, the management and operation of the Company, or any dispute that may arise with any such Members (each a "*Company Legal Matter*"); (iii) the Members will, if they wish counsel on a

- 27 -

Company Legal Matter, retain their own independent counsel with respect thereto and will pay all fees and expenses of such independent counsel; (iv) Legal Counsel may represent the Company and/or certain of its Affiliates in connection with any and all Company Legal Matters; and (v) Legal Counsel may represent any Member on other matters.

*Remainder of Page Intentionally Left Blank.*
*Signature Pages To Follow.*

IN WITNESS WHEREOF, the undersigned, being the Manager, has caused this Agreement to be duly adopted by the Company on this 1ˢᵗ day of July, 2011.

STEVEN YOUNG

The undersigned, being the Members, do hereby ratify, confirm, and approve the adoption of this Agreement as the company agreement of the Company, and do hereby assume and agree to be bound by and to perform all of the terms and provisions set forth in this Agreement on this 1st day of July, 2011.

_____
CHRIS KYLE

_____
MARK SPICER

_____
STEVEN YOUNG

_____
R. W. BO FRENCH

AMENDED AND RESTATED

COMPANY AGREEMENT

OF

CRAFT INTERNATIONAL LLC

(A Texas Limited Liability Company)

EXHIBIT A

1.    Company Information:

Name of Company:                         Craft International LLC

Address, Telephone and                   2101 Cedar Springs Road, Suite 1400
Facsimile Number of Company:             Dallas, Texas 75201

                                         Telephone:    (214) 550-6960
                                         Facsimile:    (214) 550-6963

Registered Agent and Registered Office:  2101 Cedar Springs Road, Suite 1400
                                         Dallas, Texas 75201

Tax Matters Partner:                     Steven Young

2.    Managers:

    a.    Name of Manager:               Steven Young

          Address, Telephone and         2101 Cedar Springs Road, Suite 1400
          Facsimile Number:              Dallas, Texas 75201

                                         Telephone:    (214) 550-6960
                                         Facsimile:    (214) 550-6963

3.    Members:

    a.    Name of Member:                                Chris Kyle

              Address, Telephone and          2101 Cedar Springs Road, Suite 1400
              Facsimile Number:               Dallas, Texas 75201

                                          Telephone:    (214) 550-6960
                                          Facsimile:    (214) 550-6963

              Capital Contribution:              $850

              Units:                               850,000

              Date Became Member:              December 18, 2009

    b.    Name of Member:                                Mark Spicer

              Address, Telephone and          2101 Cedar Springs Road, Suite 1400
              Facsimile Number:               Dallas, Texas 75201

                                            Telephone:    (214) 550-6960
                                          Facsimile:    (214) 550-6963

              Capital Contribution:              $50

              Units:                               50,000

               Date Became Member:              December 18, 2009

    c.    Name of Member:                                Steven Young

              Address, Telephone and          2101 Cedar Springs Road, Suite 1400
              Facsimile Number:               Dallas, Texas 75201

                                            Telephone:    (214) 550-6960
                                          Facsimile:    (214) 550-6963

              Capital Contribution:              $50

              Units:                               50,000

               Date Became Member:              December 18, 2009

d.     Name of Member:              R. W. Bo French

Address, Telephone and            2101 Cedar Springs Road, Suite 1400
Facsimile Number:                 Dallas, Texas 75201

Telephone:     (214) 550-6960
Facsimile:      (214) 550-6963

Capital Contribution:            $50

Units:                            50,000

Date Became Member:          January 1, 2011

A-3

**AMENDED AND RESTATED**

**COMPANY AGREEMENT**

**OF**

**CRAFT INTERNATIONAL LLC**

**(A Texas Limited Liability Company)**

<u>EXHIBIT B</u>

FORM OF 12% CONVERTIBLE PREFERRED NOTE

[Attached]

# AMENDED AND RESTATED

# COMPANY AGREEMENT

# OF

# CRAFT INTERNATIONAL LLC

## (A Texas Limited Liability Company)

### EXHIBIT C

### SPOUSE'S AGREEMENT

Reference is made to that certain Company Agreement of Craft International LLC (the "*Agreement*").  In consideration of the terms of the Agreement, in consideration of the Company's allowing the undersigned Member to become a Member of the Company, and for other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned shall be bound by the terms of the Agreement as though parties thereto.

Executed as of _____ ___, 20__.

MEMBER:

_____

Name:_____

SPOUSE OF MEMBER:

_____

Name:_____